Dr. Henry M. **LADREY**, Appellant,

v.

**COMMISSION ON LICENSURE TO PRACTICE The HEALING ART IN The DISTRICT OF COLUMBIA,** Appellee.

No. 13906.

United States Court of Appeals District of Columbia Circuit.

Argued April 22, 1958.

Decided July 31, 1958.

Certiorari Denied Dec. 15, 1958. See 79 S.Ct. 288.

Mr. William B. Bryant, Washington, D. C., with whom Messrs. William C\

Gardner and Joseph C. Waddy, Washington, D. C., were on the brief, for appellant.

Mr. Harry T. Alexander, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., Lewis Carroll, E. Riley Casey and Robert J. Asman, Asst. U. S. Attys., were on the brief, for appellee.

Before EDGERTON, Chief Judge, and PRETTYMAN, WILBUR K. MILLER, BAZELON, FAHY, WASHINGTON, DANAHER, BASTIAN and BURGER, Circuit Judges, sitting en banc.

DANAHER, Circuit Judge.

The Commission on Licensure to Practice the Healing Art in the District of Columbia brought an equity action [1] seeking the revocation of the license of the appellant to practice medicine and surgery in the District of Columbia. Judgment having been entered in favor of the Commission, this appeal followed.

The complaint charged that appellant had been guilty of "misconduct" in that while a duly licensed and registered doctor and surgeon he had on or about November 23, 1954, prescribed or administered a drug or had used an instrument on the person of a pregnant woman with the intent of procuring a miscarriage, as a result of which the woman had a miscarriage and died three days later. The trial judge found the appellant guilty accordingly, but not guilty in two other charged particulars: (1) of having visited the deceased, but denying he had done so; and (2) of failing to notify the police or the coroner of her death.

Appellant here complains of error in four respects. First, he charges the finding that he committed the abortion is clearly erroneous and rests upon insufficient grounds. Next he argues that the statutory term "misconduct" is too vague and indefinite to meet the requirements of due process, and that revocation of a doctor's license may be had only under D.C. Code § 2–131 (1951) [2] following conviction of a felony. Finally, he challenges, because of the prohibition against wire tapping,[3] the admission of details of two telephonic conversations as part of testimony by a police officer who listened on a telephone extension while a material witness talked by telephone to the appellant.

## I

The trial court's findings of fact emerged from a conflict which it was singularly the duty of the trial judge to resolve. Our review discloses substantial evidence of record from which the trier might fairly conclude that the decedent had been aborted and that the appellant had undertaken to, and did, perform whatever acts were involved. That the decedent died as a result is beyond peradventure. We cannot say that the court's findings have been shown to be clearly erroneous, indeed a careful examination of the transcript leads us to agreement with the findings of the trier and the conclusions based thereon.

## II

The Code's use of the word "misconduct" [4] seems at first reading to pre-

1. D.C. Code § 2–123 (1951), in the portion here pertinent reads as follows:
 "The District Court of the United States for the District of Columbia, sitting as a court of equity, may suspend or revoke any license issued and any registration effected under this chapter, upon evidence showing to the satisfaction of the court that the licentiate or registrant, as the case may be, has been guilty of misconduct or is professionally incapacitated."

2. This section in pertinent part reads:
 "If a person licensed * * * be convicted in the District Court of the

United States for the District of Columbia of any felony, the court, without further hearing or procedure, may * * * revoke, the license * * * of the defendant * * *."

3. 47 U.S.C.A. § 605 (1952) reads in pertinent part:
 " * * * and no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication * * *."

4. Supra note 1.

sent a problem in that no statutory standards to govern its present application have been set forth. When we perceive, however, that the statute permits revocation upon this ground only after the institution of action in the United States District Court for the District of Columbia sitting as a court of equity, we first may fairly look to the act as a whole, its purpose and objectives, and then to the complaint itself and to the pleadings of record. In this perspective, we observe, Paragraph 3 of the complaint was quite specific in that the "misconduct" charged had been spelled out in the words of the criminal statute which defines the offense.[5] Surely appellant may not be heard to say that the allegations as to the particular offense are not sufficiently stated.[6]

There was no claim at the trial that appellant had not been fully apprised of the nature of the offense. Had he been in doubt as to particulars either to enable him to plead or to prepare for trial, he might have moved for a more definite statement under the Rule.[7]

There has been no claim of variance between the allegations and the proof. There is no suggestion that the complaint and the evidence offered to support it had involved elements of surprise prejudicial to the appellant's case.[8] It is not argued that the statute transcends the power of Congress or that practitioners of medi-

cine may not be regulated.[9] It is argued, and the point is raised here for the first time, that the statute is "so vague and indefinite as to violate the requirements of due process."

 After providing that the District Court sitting as a court of equity may revoke a license where the licentiate "has been guilty of misconduct or is professionally incapacitated,"[10] the Code continues that proceedings shall be commenced by verified petition. "Proceedings shall be conducted according to the ordinary rules of equity practice and such supplementary rules as said [District Court] may deem expedient to carry into effect the purpose and intent of this chapter." The Court is authorized to determine whether a license shall be suspended or revoked. Its decision is subject to appeal to this court.

The "Healing Arts Practice Act, District of Columbia, 1928"[11] repealed the earlier act governing the practice of medicine and surgery in the District[12] which by its section 10 had committed revocation to a board of medical supervisors. The board had been authorized to act for various causes, such as the "employment of fraud or deception in passing the examinations * * * chronic inebriety, the practice of criminal abortion, conviction of crime involving moral turpitude, or unprofessional or dishonorable conduct."[13] The present act elimi-

5. D.C. Code § 22-201 (1951) reads in part: "Whoever, with intent to procure the miscarriage of any woman, prescribes or administers to her any medicine, drug, or substance whatever, or with like intent uses any instrument or means * * *." There was no claim by appellant that he had acted to preserve the victim's life; he denied the charge. Cf. D.C. Code § 22-201 (Supp. VI 1957).

6. Powers v. United States, 1942, 75 U.S. App.D.C. 371, 128 F.2d 300, certiorari denied, 1942, 316 U.S. 693, 62 S.Ct. 1300, 86 L.Ed. 1764.

7. Fed.R.Civ.P. 12(e), 28 U.S.C.A., and see generally, Moore, Federal Practice ¶12.18 (2d ed. 1948).

8. Cf. Berger v. United States, 1935, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314.

9. Cf. Williamson v. Lee Optical Co., 1955, 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563; Watson v. State of Maryland, 1910, 218 U.S. 173, 30 S.Ct. 644, 54 L.Ed. 987; Kemp v. Board of Medical Supervisors, infra note 18.

10. Supra note 1.

11. Act of February 27, 1929, 45 Stat. 1326. For additional background, see H.R.Rep. No. 2009, 70th Cong. 2d Sess. (1929) re S. 3936 and House debate 70 Cong. Rec. Part 3, 3272 et seq., 70th Cong. 2d Sess. (1929).

12. Act of June 3, 1896, 29 Stat. 198.

13. Cf. Czarra v. Board of Medical Supervisors, 1905, 25 App.D.C. 443. There this court had said that the practice of criminal abortion, though made a separate criminal offense, was "sufficient

nated the board of medical supervisors as judges in revocation proceedings and substituted the United States District Court, sitting as a court of equity. The licentiate in every case has available to him the full protection of the Federal Rules. "Misconduct" as a ground for suspension or revocation is not left as a matter of opinion [14] but is susceptible to complete exposition under the Rules and requires proof as a matter of fact accordingly.

Nor can we doubt that every medical practitioner knows fully that the performance of a criminal abortion is misconduct.[15] He need not guess at the meaning of the term in view of his status and the Code which governs. "The reason of the law, as indicated by its general terms, should prevail over its letter, when the plain purpose of the act will be defeated by strict adherence to its verbiage." [16] The purpose of the statute here is clear and calls for no further exploration into semantics.[17] Congress intended to provide a remedial measure for the protection of the public,[18] and "misconduct" certainly included, and must have

been known by a medical practitioner to have included, the performance of an illegal abortion.[19]

We need not rest upon the foregoing for quite apart from what has been said, the appellant failed in the District Court to raise any question as to the constitutionality of the statute. Accordingly, we go no further into this aspect of the case.[20]

### III

█ It is insisted that, in any event, resort may not be had to proceedings under D.C. Code § 2–123 (1951), for revocation may be ordered only after *conviction* of a felony. We are pointed to D.C. Code § 2–131 which provides that if one licensed "be convicted in the District Court of the United States for the District of Columbia of any felony, the court, without further hearing or procedure, may suspend * * * or may revoke, the license * * * of the defendant, in addition to imposing any other penalty provided by law." This section simply provides an *additional* remedy and for summary action when a

---

cause" for revocation. On the other hand, distribution of a lewd publication was held not to ground the Board's finding of unprofessional or dishonorable conduct, since such terms had not been defined. Thus insufficient safeguards had been provided for the practitioner "when prosecuted for the commission of a minor offense." Id., at page 454.

14. Cf. American School of Magnetic Healing v. McAnnulty, 1902, 187 U.S. 94, 104–106, 23 S.Ct. 33, 47 L.Ed. 90.

15. Cf. United States v. Wurzbach, 1930, 280 U.S. 396, at page 399, 50 S.Ct. 167, at page 169, 74 L.Ed. 508, where Holmes, J. writes:

"[The objection] would be open even if we accepted the limitations that would make the law satisfactory to the respondent's counsel. But we imagine that no one not in search of trouble would feel any. Wherever the law draws a line there will be cases very near each other on opposite sides. The precise course of the line may be uncertain, but no one can come near it without knowing that he does so, if he thinks, and if he does so, it is familiar to the criminal law to

make him take the risk. Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L. Ed. 1232." And see Rathbun v. United States, 1957, 355 U.S. 107, 109, 78 S.Ct. 161, 2 L.Ed.2d 134; United States v. Ragen, 1942, 314 U.S. 513, 523, 62 S. Ct. 374, 86 L.Ed. 383.

16. Pickett v. United States, 1910, 216 U.S. 456, 461, 30 S.Ct. 265, 267, 54 L.Ed. 566; United States v. Petrillo, 1947, 332 U.S. 1, 7, 67 S.Ct. 1538, 91 L.Ed. 1877.

17. See, however, as to "misconduct," Hatfield v. New Mexico State Board of Registration, etc., 1955, 60 N.M. 242, 246, 290 P.2d 1077, 1080.

18. Kemp v. Board of Medical Supervisors, 1917, 46 App.D.C. 173, 180.

19. Cf. Cherry v. Board of Regents, 1942, 289 N.Y. 148, 158, 44 N.E.2d 405, 411.

20. Duignan v. United States, 1927, 274 U.S. 195, 200, 47 S.Ct. 566, 71 L.Ed. 996; Wong Tai v. United States, 1927, 273 U.S. 77, 78, 47 S.Ct. 300, 71 L.Ed. 545; cf. Ullmann v. United States, 1956, 350 U.S. 422, 439 note 15, 76 S.Ct. 497, 507, 100 L.Ed. 511; and see generally, United States v. Petrillo, supra note 16, 332 U.S. at page 10, 67 S.Ct. at page 1543.

licentiate shall *here* have been convicted of "any" felony. It is clear that any such conviction is to be deemed to establish without more, the unfitness of the licentiate to continue to hold a license. The section avoids circuity and duplication in proceedings.[21] Dispelled is all necessity for weighing offenses involving moral turpitude and like considerations.[22] Moreover, the felony to predicate any such summary forfeiture must have been committed *in the District of Columbia,* where as proceedings under D.C. Code § 2–123, may rest upon a comparable offense committed in nearby Virginia, where appellant also had an office, or elsewhere, with or without conviction.[23] The appellant has mistakenly argued that a conviction of "any felony" is a prerequisite to an equity proceeding for revocation under § 2–123.

### IV

■ Detective-sergeant Gosman was permitted, over appellant's objection, to relate the details of a telephone conversation between appellant and one Matthews who had told appellant of the pregnancy of the deceased woman and who then arranged to bring the woman to appellant's office. Matthews at the police headquarters had given a statement to officers of the homicide squad. Thereafter, while still at headquarters, with the officer on an extension telephone as Matthews knew, he phoned the appellant who was in his own office. Matthews told the appellant he had been questioned throughout the entire day by the police and that he was scared.

"Dr. Ladrey told Matthews to come to his office," the officer testified, and then appellant hung up the telephone.

"Matthews made a second telephone call in the same manner," and (we omit some detail) "Dr. Ladrey told Matthews to catch a taxicab and come directly to his office on N Street." After further conversation, "Dr. Ladrey asked Matthews if he was sure he wasn't being followed by the police. He stated he was sure he wasn't being followed by the police."

When appellant was interviewed by the officer, "He admitted most of the conversation," but denied asking "Are you sure you are not being followed by the police"[?]

So ran the testimony which appellant urges was erroneously admitted on the ground "that Gosman's monitoring on an extension telephone constituted wire tapping." He argues that "Matthews' 'acquiescence' to Gosman's listening can hardly be equated with 'authorizing' him to listen," and that "there is no circumstance which will support the theory that Matthews *authorized* Gosman to *divulge* the conversation." Thus the statute[24] was violated, he claims, in that the appellant had not authorized the officer to "intercept" and to "divulge" the intercepted communication.[25]

We must reject his contention. No one is bound to answer a ringing telephone.

21. See Kemp v. United States, 1914, 41 App.D.C. 539, 51 L.R.A.,N.S., 825, certiorari denied 1914, 234 U.S. 756, 34 S.Ct. 675, 58 L.Ed. 1579, and compare note 18, supra.

22. Cf. Kemp v. Board of Medical Supervisors, supra note 18. It may be noted that many acts are specifically proscribed by various sections of the Code as to which penalties are provided by D.C. Code § 2–130 (Supp. VI, 1957). In addition, if one unlawfully practices the healing arts and is convicted accordingly, future violations may be enjoined under § 2–132.

23. It has been held elsewhere that revocation proceedings may run against a licentiate even after his acquittal on an abortion charge. See, e. g., Munk v. Frink, 1908, 81 Neb. 631, 638, 116 N.W. 525, 528, 17 L.R.A.,N.S., 439.

24. Supra note 3.

25. He relies upon United States v. Polakoff, 2 Cir., 1940, 112 F.2d 888, 134 A.L.R. 607; Sullivan v. United States, 1955, 95 U.S.App.D.C. 78, 219 F.2d 760. Both cases suggest that the respective parties to a telephonic conversation are "senders."

If he does pick up the receiver, he is not required to talk to the outside caller. If he chooses to talk, he may well understand that the calling party, the original "sender," may have others listening to the conversation, whether in a group around the caller's telephone or on an extension attached to it. Quite apart from any such observations, the Supreme Court has passed upon the point,[26] adversely to appellant's claim. "Each party to a telephone conversation takes the risk that the other party may have an extension telephone and may allow another to overhear the conversation. When such takes place there has been no violation of any privacy of which the parties may complain."[27] The Court held squarely that Section 605 had not been violated, for there had been no "interception" as Congress intended the word to be used. We need go no further.

We reviewed this case *en banc* because of the importance of various aspects of the appellant's case. After extensive consideration of the several points, we are satisfied there is no error.

Affirmed.

BAZELON, Circuit Judge, with whom EDGERTON, Chief Judge, and FAHY, Circuit Judge, join (dissenting).

I dissent from the majority's holding that Detective Sergeant Gosman's testimony concerning the telephone conversations was properly received in evidence. If that testimony was inadmissible the Government does not contend that it was not prejudicial. The testimony recounted two telephone conversations between appellant and one Matthews, the paramour of the deceased woman upon whom the abortion was allegedly committed, to which police listened on an extension telephone. The calls were made by Matthews from the office of the Homicide Squad where he was being questioned. He knew—but appellant did not know—that the police were listening to the conversations. Upon defense counsel's objection to Sergeant Gosman's testimony as "wire tap evidence" the trial judge ruled the testimony admissible because "one of the parties acquiesced in the conversation being intercepted." He said it did "not make any difference" to his finding of acquiescence that this party was in the custody and control of the police.

Section 605 of the Federal Communications Act, 48 Stat. 1103, 47 U.S.C.A. § 605, commands that " * * * no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person * * *."

The question is whether Sergeant Gosman "intercepted" the communications between Matthews and the appellant. The majority treats the Supreme Court's recent decision in Rathbun v. United States, 1957, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134, as dispositive of this issue. I disagree. In Rathbun, one Sparks, a telephone subscriber, expected a long distance call threatening his life. He "requested" the police to overhear the conversation on his telephone extension, and they complied with his request. 355 U.S. at page 108, 78 S.Ct. at page 162. The request was voluntary in every sense. The Supreme Court held that compliance with the request was not an "interception." The present case is quite different. There is nothing to suggest that Matthews, who telephoned to the present appellant, invited or requested the police to listen to the conversations. On the contrary, it is quite as likely that the plan to have the police listen and even the plan to have Matthews telephone to the appellant, originated with the police. It is not even clear that Matthews freely consented, though he did at least submit.

26. Rathbun v. United States, supra note 15, 355 U.S. at pages 110–111, 78 S.Ct. at pages 163–164.

27. Id. 355 U.S. at page 111, 78 S.Ct. at page 164; and see discussion, Bradley and Hogan, Wiretapping: From Nardone to Benanti and Rathbun, 46 Geo. L.J. 418, 434 et seq. (1958).

He was not using his telephone but a police telephone. There is nothing to suggest that he could have prevented them from using their own telephone in their own way. In other words, there is no evidence that he could have made the calls without their listening to it. It does not even appear that they consulted him instead of merely telling him they were going to listen. In my opinion the Rathbun rule, that there is no interception of a telephone conversation when one party to it invites a third person to listen, has no application to these facts.

Since the record does not show whether or not there was interception, I would vacate the judgment and remand the case to the District Court for reconsideration upon a supplemented record.

In that disposition of the case it is not necessary to reach the constitutional question of the validity of the license revocation statute. But, since I read the majority as deciding that question, it is permissible to record my dissent from its conclusion.

The statute, D.C.Code § 2–123, authorizes the District Court to revoke a doctor's license "upon evidence showing to the satisfaction of the court that [he] has been guilty of *misconduct* * *." Emphasis supplied. No one, I suppose, would suggest that Congress may validly authorize the District Court to convict an individual of a crime and sentence him to fine or imprisonment for being guilty of "misconduct." Such a standardless criminal statute would obviously be void for vagueness. And, as this court has said, "the principles that apply in the protection of" a doctor's right to practice his profession "are of the same general nature, though not in all particulars, as those which safeguard him when prosecuted for the commission of a minor offense." Czarra v. Board of Medical Supervisors, 1905, 25 App.D.C. 443, 454.

In Czarra, we held invalid the predecessor statute of D.C.Code § 2–123 which authorized license revocation on a finding of "unprofessional or dishonorable conduct."

We said:

"Doubtless all intelligent and fair-minded persons would agree in the opinion of the board of medical supervisors that the act charged against the appellant in the case at bar amounted to conduct both unprofessional and dishonorable. But this is not the test of the validity of the particular clause of the statute. The underlying question involved in all cases that may arise is whether the courts can uphold and enforce a statute whose broad and indefinite language may apply not only to a particular act about which there would be little or no difference of opinion, but equally to others about which there might be radical differences, thereby devolving upon the tribunals charged with the enforcement of the law the exercise of an arbitrary power of discriminating between the several classes of acts." 25 App.D.C. at page 453.

We concluded that the standard provided —"unprofessional or dishonorable conduct"—was essentially no standard at all. Yet that standard, in a statute dealing with the medical profession, is probably clearer and more definitive than the "misconduct" standard provided by the instant statute. The earlier statute would at least exclude as a ground of revocation such misconduct as does not reflect on professional standing or personal honor. Under the present statute any misconduct—even traffic offenses—could, in the uncontrolled discretion of the District Court, serve as a basis for revoking a license.