**Ernest L. GREENE, Petitioner,**

v.

**The REAL ESTATE COMMISSION of the District of Columbia, Respondent.**

**No. 3874.**

District of Columbia Court of Appeals.

Argued Jan. 10, 1966.

Decided April 15, 1966.

Thomas Penfield Jackson, Washington, D. C., with whom Robert M. Gray, Washington, D. C., was on the brief, for petitioner.

John R. Hess, Asst. Corp. Counsel, with whom Milton D. Korman, Acting Corp. Counsel, and Hubert B. Pair, Asst. Corp. Counsel, were on the brief, for respondent.

Before HOOD, Chief Judge, and QUINN and MYERS, Associate Judges.

HOOD, Chief Judge:

This appeal is from an order of the Real Estate Commission suspending petitioner's real-estate broker's license for a period of ninety days. The suspension was based on a finding that petitioner had violated the provisions of Sections 45–1401 and 45–1408(h) of D.C.Code 1961.[1] Petitioner claims that the evidence did not support the findings.

---

1. § 45–1401. Acting as broker or salesman without license unlawful.

That on and after ninety days from Aug. 25, 1937, it shall be unlawful in the District of Columbia for any person, firm, partnership, copartnership, association, or corporation (foreign or domestic) to act as a real-estate broker, real-estate salesman, business-chance broker or business-chance salesman, or to advertise or assume to act as such, without a license issued by the Real Estate Commission of the District of Columbia.

§ 45–1408. Suspension or revocation of license—Causes enumerated.

(h) Demonstrated such unworthiness or incompetency to act as a real-estate broker or real-estate salesman or a business-chance broker or a business-chance salesman as to endanger the interests of the public.

There was evidence that in the fall of 1963 petitioner Greene was a full-time Government employee and a part-time real-estate broker, having obtained his broker's license in April 1962. His broker's business was conducted in an office whose rental he shared with Lawrence R. Cropp under "an equal responsible lease agreement." At one time Cropp had been a licensed real-estate broker and Greene had worked for him as a licensed salesman. After Cropp's license had been revoked and Greene had obtained a broker's license, the two continued to occupy the office formerly occupied by Cropp. Cropp covered the office during the day "doing odds and ends things" for Greene and getting paid "odds and ends money." The third person in Greene's office was Alvin Scott, also a full-time Government employee, who worked as a part-time salesman for Greene. Scott had a temporary salesman's license but was quite inexperienced.[2] Greene knew that Cropp helped and advised Scott in the office, and Greene knew that Cropp was in a position to hold himself out as a salesman for Greene.

In the fall of 1963 Robert Moore gave Greene an exclusive listing to sell his house for $18,500. The Richard Paynes saw Greene's newspaper advertisement of the house and called his office. Cropp answered the call and arranged to take the Paynes to see the house. Cropp accompanied by Scott, took the Paynes to the house and showed it to them. A short time later the Paynes signed the contract to buy the house for $18,000. This contract was taken to them by Cropp alone who accepted their deposit in the form of $250 cash and a check for $250 payable to Cropp.

Moore had agreed to the $500 reduction in the selling price after Greene told him he would realize as much on the sale at the lower price if financing could be done by means of a so-called "magic loan." The magic loan sought appears to have been a $16,000 first trust loan on a 'iouse selling for $18,000, and it could not be obtained. As a result a new contract was required.

Greene and Cropp went to Payne's home to explain the second contract, and this was the first time that Payne had seen Greene. Although Greene testified that he explained to the Paynes that the second contract would have to be for $18,500, they denied that anything was said about raising the price from $18,000 to $18,500. Greene assigned to Scott the preparation of the second contract and Scott, mistakenly he said, inserted the old price of $18,000. When the contract was presented to Moore he signed without reading it and did not observe that the price was $500 less than the price at which he had listed his home. Greene never saw the second contract until after Cropp had taken it to the Paynes and obtained their signatures.

When Greene finally read the contract he saw the price of $18,000 and instructed Scott, whose deal this was supposed to be, to change the price to $18,500 and have the correction approved and initialed by both the Moores and the Paynes. Scott made the change but failed to get it initialed by the Paynes. His explanation was that he could not find the Paynes at home. Prior to settlement, Cropp, acting on Greene's instructions, transported the Paynes to a lending institution to arrange for a loan.

Greene, knowing that the change in the contract had never been initialed by the Paynes, proceeded to the office where settlement was to be made. There the Paynes, according to their testimony, first learned that the contract price of $18,000 had been changed to $18,500. They testified that they expressed dissatisfaction with the change but proceeded with settlement for fear of being charged with failure to complete the deal. Shortly after settlement Payne was advised that he "had been taken" and he stopped payment on the $2,000

2. A temporary salesman's license is issued to one who has not taken and passed the required examination.

check he had given as down payment and refused to go through with the purchase at $18,500. Moore resold his home to someone else for less than $18,000. Law suits followed involving the Moores, Greene and the Paynes, and were finally settled.

The Real Estate Commission charged that petitioner "did utilize the services of an unlicensed salesman and did sanction and permit said unlicensed salesman to assume to act as a licensed salesman under the Real Estate Broker's license of said Greene, in violation of Sections 45–1401 and 45–1408(l), D.C.Code, 1961." Petitioner argues that he cannot be punished under Section 45–1401 for the unlawful acts of his employee Cropp. He relies upon language in Davis v. Missouri Real Estate Commission, 211 S.W.2d 737, 740 (Mo.App.1948), a case involving suspension of a broker's license for the act of his employee:

> The rule of respondeat superior, under which civil liability upon the master for the acts of an employee is imposed, is not applicable when it comes to the imposition of a penalty or forfeiture. Unless the statute imposing the penalty expresses a contrary intent, an employer will be held liable in such cases only in case of some culpable fault or omission on his part. 35 Am.Jur. 1045, Sec. 605.

We agree with the legal principle of Davis but here the record clearly shows culpable fault and omissions on the part of the employer Greene amounting to his use of an unlicensed salesman, and thereby his violation of the statute which forbids unlicensed persons to act as salesmen.

■ Greene, knowing that Cropp had lost his license, employed him, ostensibly, as an "answering service, secretary, messenger, depending on the need as it arose." Cropp alone sat in Greene's office during the day while Greene and Scott were at their full-time jobs. According to petition-

er, Cropp had "no fixed wage or salary" but was paid under "a loose arrangement" as his services were rendered. Greene claimed he did not know that Cropp showed the Paynes the house, took them the first contract, obtained their signatures and accepted their deposit. But petitioner himself took Cropp, not Scott, with him to discuss the second contract; petitioner asked Cropp to take the Paynes to a lending institution to arrange a loan; and petitioner had Cropp, not Scott, accompany him to settlement with the Paynes. There was little in Greene's actions in front of the Paynes to suggest to them that the "deal" was Scott's rather than Cropp's. These acts of Greene amounted to at least a holding out of Cropp as his authorized salesman. Indeed, instructing Cropp to take the Paynes to a bank to arrange a loan was directing him to perform the act of a salesman. Petitioner's argument that Cropp was acting only as driver of the automobile to transport the Paynes to and from the lending institution is not convincing in view of what Greene knew about Cropp. Under the circumstances, Greene's failure to explain to the Paynes that Cropp was not his authorized salesman was certainly a culpable omission on his part.

Moreover, when Cropp showed the house to the Paynes and later obtained their contract signatures and deposit, clearly he was performing the acts of a real estate salesman.[3] But Greene claims he had no knowledge of these acts of Cropp. Ignorance, however, is no excuse for one who in effect blindfolds himself or fails to inquire about significant happenings in his own office. Therefore Greene's participation through fault and omission in the unlawful acts of his employee made him punishable for disregarding Section 45–1401.

■ The suspension of petitioner's license was also grounded on Section 45–1408(h). Petitioner claims this subsection

---

3. Cropp's conduct resulted in his conviction in the District of Columbia Court of General Sessions, Criminal Division, of acting as a real estate salesman without a license. Cropp was not called as a witness in the present proceedings.

of the Real Estate Broker's Act is void for uncertainty. We do not agree. The statute does not speak merely to general unworthiness or incompetence but empowers the Real Estate Commission to revoke or suspend the license of a broker who has "[D]emonstrated such unworthiness or incompetency *to act as a real-estate broker* * * * as to endanger the interests of the public." (Emphasis supplied.) Our statute, when reasonably interpreted, punishes only conduct relating to petitioner's business and not to some outside activity of a broker. This distinguishes the present case from Czarra v. Board of Medical Supervisors, 25 App.D.C. 443 (1905), relied on by petitioner, which reversed an order of the medical board revoking the license of a physician to practice medicine in the District of Columbia because of "unprofessional and dishonorable conduct"—he had been found guilty of distributing an obscene pamphlet. While we find no previous case in this jurisdiction specifically challenging the validity on its face of Section 45–1408 (h),[4] we note authority from other jurisdictions which have recognized the power of real estate commissions acting under similar statutes to punish misconduct connected to performance of duties as a real estate agent. Robinson v. Missouri Real Estate Commission, 280 S.W.2d 138, 56 A.L.R.2d 566 (Mo.App.1955), 56 A.L.R.2d 566, and Annot. 56 A.L.R.2d 573. See also Eberman v. Massachusetts Bonding & Ins. Co., D.C.Mun.App., 41 A.2d 844 (1945).

Cf. Whiting v. Real Estate Commission, D.C.App., 198 A.2d 742 (1964). Since Section 45–1408(h) is limited to conduct "as a broker" the statute is sufficiently definite to warn brokers of proscribed conduct.[5] When the charges brought by the Commission relate directly to activity as a broker,[6] and there is evidence to support them, punishment may follow under Section 45–1408(h).

Petitioner's contention that the evidence is insufficient to sustain findings of fact which constitute violation of Sections 45–1401 and 45–1408(h) has little merit. Surely Cropp acted as a salesman;[7] and the curious circumstances of Greene's pay and "loans" to Cropp were evidence from which the Commission could have reasonably concluded that among the various services Cropp was expected to render "as the need arose" were services within the statutory definition of a real-estate salesman. Thus there was evidence of culpable fault on the part of Greene for the unlawful acts of Cropp as salesman amounting to violation by Greene of Section 45–1401. Davis v. Missouri Real Estate Commission, supra. Petitioner's use of Cropp and his failure to obtain the Paynes' consent to the change in the contract price prior to settlement amply demonstrated his incompetence as a real-estate broker justifying suspension of his license under 45–1408(h).

Affirmed.

4. In Brown v. Winston, 91 U.S.App.D.C. 58, 197 F.2d 601 (1952), the United States Court of Appeals upheld the suspension of a broker's license under this subsection without discussion of its validity.

5. See Ladrey v. Commission on Licensure to Practice, Etc., 104 U.S.App.D.C. 239, 261 F.2d 68 (1958), cert. denied, 358 U.S. 920, 79 S.Ct. 288, 3 L.Ed.2d 239.

6. Specifications under the charges included accusations that petitioner had used Cropp to obtain a contract offer and deposit from the Paynes, and had altered the contract purchase price without the knowledge or authorization of the Paynes.

7. "One act" of selling real estate or negotiating a loan on real estate constitutes one a real-estate salesman under Section 45–1402.