**UNITED STATES of America**

v.

**James J. LAUGHLIN.**

**Crim. No. 599–63.**

United States District Court
District of Columbia.

Oct. 8, 1963.

As Amended Nov. 14, 1963.

Joseph A. Lowther, Asst. U. S. Atty., David C. Acheson, U. S. Atty., for plaintiff.

William J. Garber, James J. Laughlin, Washington, D. C., for defendant.

YOUNGDAHL, District Judge.

The defendant in this case is an attorney who is charged with perjury, 18 U.S.C. § 1621, in giving the following answers to the following questions before a duly constituted grand jury on March 6, 1963:

"Q. Do you even know Bernice Gross?

"A. No, I wouldn't say I know her if I saw her on the street. I heard her name because it came out during the trial. I would not know her if I met her on the street.

"Q. Have you ever talked to Bernice about this case?

"A. At no time.

"Q. Ever talked to her on the telephone at all?

"A. No."

The indictment alleges twenty-six different dates prior to the above testimony before the grand jury on which the defendant allegedly talked to Bernice Gross on the telephone. The indictment further alleges that the grand jury was conducting an inquiry to determine, among other things, whether, in connection with the case of United States v. Allan U. Forte, Criminal Case No. 741–61, there had been committed in the District of

Columbia violations of 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 1503 (Influencing Witness), 18 U.S.C. § 1621 (Perjury), 18 U.S.C. § 1622 (Subornation of Perjury), 22 D.C.C. § 201 (Abortion), 22 D.C.C. § 701 (Bribery). It was further alleged, among other things, that it was material to this grand jury inquiry to ascertain the identity and actions of any person or persons who might have conspired to commit, or committed, the offense of endeavoring, corruptly, to influence a person being, or about to be, a witness at the proceedings preliminary to, and in the trial of Counts One and Two of United States v. Allan U. Forte, supra, and the identity and actions of any person or persons who might have given or received or offered or been offered any money or other things of value for the purpose of corruptly influencing, intimidating, or impeding any witness in United States v. Allan U. Forte, supra. It was further alleged that it was material to the above inquiry to ascertain the relationship and any communications between one Bernice Gross, a witness under subpoena in United States v. Allan U. Forte, supra, and any of the persons who might have been engaged in influencing or attempting to influence witnesses as summarized above.

 When it appeared at the beginning of the trial that the Government intended to offer in evidence certain tape recordings of telephone communications between the defendant Laughlin and Bernice Gross, two of which communications preceded the date of the defendant's testimony before the grand jury, the Court, in the absence of the jury, heard testimony for several days to determine:

(1) Whether Bernice Gross had voluntarily given her consent to having the recordings made of her telephone calls with the defendant, ("[N]o person not being authorized by the sender shall intercept any communication * * *." 47 U.S.C. § 605.)

(2) Whether, assuming consent on the part of Bernice Gross, receipt of such evidence would violate 47 U.S.C. § 605, decided case law, or any provision of the Constitution.

As to the second of these points, the relevant evidence showed that the recordings were made in the office of the United States Attorney in the United States Court House. They were made by means of an induction coil which was placed under an extension telephone while Mrs. Gross called the defendant on another telephone in the same room. Both telephones were part of the regular office equipment, not installed specially for the purpose of these calls. The induction coil led to a tape recorder on which the conversations were recorded while they were being made.

On the basis of this evidence, the Court ruled that, assuming voluntary authorization on the part of Mrs. Gross, the tapes would be admissible. The Court so ruled despite the fact that neither the Supreme Court nor the Court of Appeals for this circuit has squarely passed upon the admissibility of such evidence. Without presuming to predict how those courts would decide this issue were it to arise, this Court concluded that certain cases in those courts admitted evidence under somewhat similar circumstances and that no case in those courts barred evidence secured in the manner described in the instant case. See Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963) (tape recorder on the person of a witness recorded face-to-face conversation; tapes admissible as corroboration); Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957) (witness could testify to telephone conversation overheard, with consent of one party, on extension telephone); Monroe v. United States, 98 U.S.App.D.C. 228, 234 F.2d 49 (1956) (recordings made on person of party to face-to-face conversation, admissible). In reaching this conclusion, the Court relied upon the reasoning in several cases from Courts of Appeals in other circuits and from the highest court of a state, all of which had held that recordings made under similar circumstances were not barred by 47 U.S.C. § 605 and

were admissible. Carnes v. United States, 295 F.2d 598 (5th Cir., 1962); United States v. Williams, 311 F.2d 721 (7th Cir., 1963); Carbo v. United States, 314 F.2d 718 (9th Cir., 1963); Ferguson v. United States, 307 F.2d 787 (10th Cir., 1962), cert. granted, 374 U.S. 805, 83 S.Ct. 1698, 10 L.Ed.2d 1030 (1963); People v. Malotte, 46 Cal.2d 59, 292 P.2d 517 (1956). But see United States v. Polakoff, 112 F.2d 888, 134 A.L.R. 607 (2d Cir., 1940); Reitmeister v. Reitmeister, 162 F.2d 691 (2d Cir., 1947).

As to the first point—Mrs. Gross's voluntary authorization to have the recordings made—the only testimony was that of Harold J. Sullivan, an assistant United States Attorney who had tried United States v. Allan U. Forte, supra, who had interrogated Mrs. Gross, the defendant, and others before the grand jury, and who supervised the making of the recordings. Mr. Sullivan testified that Mrs. Gross was agreeable to having the conversations taped. The Government did not put Mrs. Gross on the stand to establish the voluntariness of such authorization, and the defendant called no witnesses. In that state of the evidence, the Court concluded that the authorization had been voluntarily given, and after determining that the tapes were audible, see Monroe v. United States, 98 U.S.App.D.C. 228, 234 F.2d 49 (1956), permitted the tapes to be played before the jury.

The tapes were played during the direct examination of Mrs. Gross, who was, of course, called as a witness by the Government in the presentation of its case to the jury. She testified to a number of telephone conversations, and one meeting in person, between herself and the defendant prior to the defendant's appearance before the grand jury on March 6, 1963. She also identified the

voices on the tapes as those of herself and of the defendant. On cross-examination, however, she was asked for the first time whether she had voluntarily consented to having the recordings made, and her response was: "I felt I had to cooperate." (Tr. 160.) The Court thereupon excused the jury and questioned Mrs. Gross on the issue of voluntariness. It appeared that Mrs. Gross had been brought before the grand jury on the morning of March 1, 1963, at which time she denied having known the defendant or having talked with him. Later, she was taken to the office of Joseph M. Hannon, an assistant United States Attorney, and interrogated by Mr. Hannon and Mr. Sullivan. During the course of this interrogation, she was shown certain incriminating evidence, and finally admitted that she had perjured herself before the grand jury. She then made additional statements, which were taken down by a stenographer, and reappeared before the grand jury the same afternoon. Later that same afternoon, the first two of the several recorded telephone conversations were taped in the office of the United States Attorney. At the time the Court ruled that Mrs. Gross's authorization had been voluntarily given, and that the tapes could therefore be played before the jury, the Court had not read the following exchange between Mr. Sullivan, Mrs. Gross, and the deputy foreman of the grand jury,[1] which exchange immediately preceded the making of the recorded telephone conversations:

"BY MR. SULLIVAN:

"Q Just before the Grand Jury then one final thing. You did say, didn't you Mrs. Gross, that since you have come forward and told the truth now you would also be agreeable to having someone listen in on your extension phone tonight should Forte call you?

1. The Court received in evidence the entire transcript of the grand jury proceedings up to and including the appearance of the defendant on March 6, 1963, for the purposes of determining whether the questions put to the defendant, and his answers thereto, were material to the grand jury proceedings. See United States v. Alu, 246 F.2d 29, 33–34 (2d Cir., 1957). After reading this entire transcript, the Court concluded that the questions and answers were material to the subjects under investigation.

"A The only trouble with that is my husband doesn't know anything about this, and if somebody would have to tell him I—

"Q —I think in fairness I should advise you if this Grand Jury matter results in an indictment of anyone it is going to be public information anyway. The possibility of your husband learning is extremely great. You can think that over yourself as a practical person.

"A I still would not like it in my house, I wouldn't.

"Q You see, we have no legal way of doing it except in your house?

"A Well, I was not going to answer the phone this evening because I don't want to have anymore conversations and I was going to New York today—that's my home—but I couldn't because I had to come here, and I know I'm going tomorrow. I'm not answering the phone tonight and if he knows I'm here he's just liable not to call.

"Q I have no way at all of forcing the answer from you. It has to be your personal choice.

"A I don't.

"Q Do you have any objection of making a telephone call to Mr. Forte before leaving Washington and chat with him on the phone, as well as one with James Laughlin and chat with him on the phone?

"A I would rather not.

"Q I understand that you would rather not, but your cooperation—

"A —If I had to I would but if I don't have to I would rather not.

"Q On the record let me put this to you, all we want is the truth, you don't have to make those telephone calls?

"A I have told you the truth.

"Q Fine, but the thing we talked about on the record down in Mr. Hannon's office I'll say it right before the Grand Jury. I said to Mrs. Gross that the big fish behind an operation like this are the ones who are most guilty. The only possible way of getting the people who are putting up the money and instigating the plans of this operation is by the cooperation of someone who is in between, that is the only way to make the case on the big people. We need Mrs. Gross' cooperation and the Grand Jury's decision as to whether they would indict you for the perjury you committed this morning would be largely determined by the measure of your cooperation. You would not have to make the telephone call. You see my point?

"A I know your point very well. I understand your point very well.

"Q Mrs. Gross, you are an experienced police woman?

"A I am, very.

"Q You know the point?

"A I realize your point but I say I would rather not. If I did not have to I would rather not. If I had to I would. There is nothing I can do.

"DEPUTY FOREMAN: Mr. Sullivan, I would like to say this, and I think I speak for the Grand Jury, as regards what you said, that you would rather get the ones responsible for the over-all operation. If we don't get cooperation and can't get those we'll get the ones we can. I think you can tell this witness and any other witness, in or out of this room, that we'll go after him. We prefer the big ones but if they make it impossible for us to get the big ones we'll get the little ones.

"MR. SULLIVAN: Thank you Mr. Deputy Foreman. That's the point, Mrs. Gross. We really need your cooperation. We really do. May I ask you to wait when you leave the Grand Jury and let me suggest a program of operation to you?

"A Okay.

"MR. SULLIVAN: Thank you very much for your cooperation in telling the truth today."

(Witness was excused.)

In the light of this testimony before the grand jury and in light of Mrs. Gross's statement that she felt she "had to cooperate" in making the telephone calls and permitting them to be recorded, the Court questioned Mrs. Gross as follows:

"THE COURT: Now, Mrs. Gross, you heard the answer repeated by Mr. Kaufman, the reporter, that in answer to Mr. Laughlin's question you felt you had to cooperate in permitting these telephone calls to be made. What did you mean by that?

"THE WITNESS: Well, it wasn't a question of whether I wanted to, any more. It was what I had to do—within myself. I mean there was no threat of any kind made to me; if that is what it implied I am sorry.

"THE COURT: I still don't understand what you meant when you said that you felt you had to.

"THE WITNESS: Well, I knew I should at that point, that I—I had to. I had to cooperate—

"THE COURT: Why did you have to? Couldn't you have refused to do something?

"THE WITNESS: I don't know. I guess I could have refused.

"THE COURT: Then what did you mean when you said you had to?

"THE WITNESS: I thought it would be best for me.

"THE COURT: Best for you with reference to what possible action the Grand Jury might take in your case?

"THE WITNESS: Yes, sir." (Tr. 161-2.)

The Supreme Court has held unanimously that 47 U.S.C. § 605 "contemplates voluntary consent and not enforced agreement to publication." Weiss v. United States, 308 U.S. 321, 330, 60 S. Ct. 269, 272, 84 L.Ed. 298 (1939). This Court has concluded that the Weiss case is dispositive of the issue in the present case, and requires the exclusion of the tapes on the ground that Mrs. Gross's consent was not voluntary. In Weiss, certain defendants among a group indicted were confronted with recordings which the Government had made of telephone conversations, and decided— "[u]nder the stress of this situation," as the Supreme Court said, ibid.—to plead guilty, turn state's evidence against their co-defendants, and permit the recordings to be played. One of the defendants who cooperated in this manner was not even required to plead, and the other three who cooperated had their sentences suspended. Ibid. These facts and others indicating that certain of the defendants continued to receive Government salaries convinced the Supreme Court

"that the so-called authorization consisting of the *agreement to turn state's evidence,* by some of the defendants after they had been apprized of the knowledge of their communications by the Government's representatives, and *in the hope of leniency,* was not that intended or described by the statute and emphasis [sic. emphasizes?] the offensive use which may be made of intercepted messages, whether interstate or intrastate. It is not too much to assume the interdiction of the statute was intended to prevent such a method of procuring testimony." 308 U.S. at 330–331, 60 S.Ct. at 273, 84 L.Ed. 298. (Emphasis added.)

In the present case, it is clear to the Court that the statements of both Mr. Sullivan and the deputy foreman of the grand jury, as quoted above, amounted to an implied promise that if Mrs. Gross consented to having the recordings made, she would not be indicted for perjury. Thus there was a clear "hope of leniency," *supra,* in Mrs. Gross's mind, which hope was deliberately created by the implied promises of both Mr. Sullivan and the deputy foreman. Her consent, under the implied threat of being indicted if

she did not cooperate and under the implied promise that she would not be indicted if she did cooperate, is not the kind of "authorization" contemplated by 47 U.S.C. § 605, as Weiss makes abundantly clear. Mrs. Gross has not been indicted by the grand jury.

The Government argues that the present case is different from the facts discussed in Weiss in that here the recordings were made *after* the witness agreed to cooperate, while in Weiss the recordings were made *before* such agreement. It seems to this Court, however, that the timing of the consent does not go to the issue of whether or not it was voluntarily given, and that purported consent before the recordings are made is as bad, if not worse, than purported consent after such recordings have already been made.

Nor is the case of Ladrey v. Commission on Licensure, 104 U.S.App.D.C. 239 261 F.2d 68 (1958), cert. denied 358 U.S. 920, 79 S.Ct. 288, 3 L.Ed.2d 239, cited by the Government, relevant to the instant facts, because in that case there is no discussion of any promise of leniency in return for cooperation with the police. 104 U.S.App.D.C. at 243–244, 261 F.2d at 72–73. It is the implied promise of leniency in the present case which distinguishes it from Ladrey and from the other cases cited by the Government.

The tape recordings in the present case, inadmissible under Weiss, should not have been played within the hearing of the jury. The Court has considered instructing the jury to disregard such tape recordings and dismiss them from their minds, but because of the strong and clear impression of defendant's guilt which the recorded telephone conversations undoubtedly have made upon the minds of the jurors, such a cautionary instruction would obviously not protect the rights of the defendant to a fair and impartial trial. See, e. g., Boyer v. United States, 76 U.S.App.D.C. 397, 398, 132 F.2d 12 (1942). Under these circumstances, since the ends of substantial justice cannot be attained without discontinuing the trial, on motion of the defendant this Court will declare a mistrial.