## UNITED STATES of America
### v.
### Charles ZARKIN, Stanley L. Sonneborn.
### Crim. No. 1099-65.

United States District Court
District of Columbia.
Jan. 21, 1966.

---

Richard Coleman, Asst. U. S. Atty., Washington, D. C., for United States.

Joseph Sitnick, Washington, D. C., for defendant Zarkin.

F. Joseph Donohue, Washington, D. C., for defendant Sonneborn.

LEONARD P. WALSH, District Judge.

A man places telephone calls to persons who are suspected gamblers. He authorizes the police to monitor these calls on an extension telephone. At the time he authorizes this monitoring, he is awaiting imposition of sentence, and gives the authorization in the hope he will receive leniency. Was this authorization voluntary? That is the question before this Court.

Defendants have filed a Motion for Suppression of Evidence on the grounds that the authorization was involuntary. This Court finds that the authorization was voluntary, and in full accordance with the provisions of 47 U.S.C. 605.

### 1. The Facts of the Case

The informant in this case, a Newton Jones, at one time worked very closely with the defendants, Zarkin and Sonneborn, allegedly in matters involving a lottery operation. However, in late 1964, Jones was arrested for violation of the lottery laws, and in January, 1965, he

plead guilty to this charge. The matter was then set down for sentencing.

Mr. Jones previously had served time in jail for an embezzlement conviction. During that time he became very ill. He spent most of his term in the prison hospital. Thus, at the time in question, he became distraught over the prospect of returning to jail. Troubled and worried over this unhappy prospect, Jones consulted a friend. The friend, who had no affiliation with law enforcement, advised Jones to go to the police with an offer to act as an informer in hopes of securing an official promise of leniency. Jones took this advice.

On March 8, 1965, while still awaiting imposition of his sentence, he sought out Captain Foran of the gambling squad and made his offer to place phone calls to the defendants and authorize the police to monitor them. However, Captain Foran would not make such a promise of leniency. He gave no assurances, and in fact informed Jones that he could count upon nothing in terms of cooperation by the police. Nevertheless, Jones continued in his attempt to "whet the appetite" of the police. Therefore, the following day, March 9, 1965, Captain Foran took Jones down to the United States Attorney's office, where he was allowed to speak with Mr. Coleman, one of the Assistants. Mr. Coleman reiterated the fact that the Government would offer no promise of leniency to Jones. However, Mr. Coleman did assure him that should he cooperate with the police, Mr. Coleman would place this fact before the sentencing court. Relying on this limited assurance, Jones proceeded to cooperate with the police. While he was in the United States Attorney's office, he offered to place calls to either one or both of the defendants and to converse with them on matters relative to gambling operations which they allegedly were conducting. This offer was not accepted at that time.

Jones and Captain Foran returned to Police Headquarters, and later that same day, while at Police Headquarters, Jones placed the first of a series of monitored phone calls. The police listened to this and subsequent phone calls on a regularly installed extension telephone. They also recorded the conversations on a device connected to the extension. Jones called the apartments of both defendants, Zarkin and Sonneborn, and spoke with each of them on more than one occasion.

On March 19, 1965, Jones appeared before the court for sentencing. At that time the police had not completed the investigation they were making by means of the monitored telephone conversations. Thus, the United States Attorney made no representations to the court as to the aid which Jones had rendered the police. In spite of this, Jones did not receive a jail sentence, but was fined $750.00. Later on that day, after he had been sentenced, Jones placed the final monitored telephone call involved in this matter. Following this call, Jones and Captain Foran went to the United States Commissioner and swore out the affidavits which support the warrants in this case. Thus, Jones placed one phone call and swore to the affidavits after the imposition of his sentence.

On the basis of information secured from these telephone calls, search warrants were obtained for the premises of Zarkin and for the premises of Sonneborn. Arrest warrants, based upon this information, were issued for both defendants. Defendants ask the court to suppress the evidence seized by the police at the time these warrants were executed.

## II. *The Legal Background; Authorization to Intercept*

To attempt to speak at once to the legal question of consent in this matter is akin to hopping a freight at full steam. The Supreme Court interpretations of the statute involved in this case were well under way before the element of consent was taken aboard. Therefore, for a more complete understanding of this matter, it is perhaps best to return to the original platform.

(A) A Statutory, Not a Constitutional Question; But the Constitutional Door is Reopened.

Ostensibly in speaking to the propriety of wire tapping, we are not speaking of a constitutional question, for at an early date the Supreme Court ruled that wiretapping was neither a search nor a seizure.[1] However dirty the business may be, it was not to be cleansed by a constitutional detergent.

However, shortly after that decision, Congress tucked away in the recesses of the 1934 Communications Act a relatively innocuous section, which read in part:

"no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person." June 19, 1934, c. 652, Title VI, § 605, 48 Stat. 1103.

Within months after the enactment of this statute, it was being heralded by defense attorneys as a legislative shield against wiretapping. This came in spite of the concerted legislative rejections of proposed anti-wiretap legislation.[2]

The Supreme Court adopted this argument, and in 1937 ruled that this statute prevented the introduction of evidence obtained by a wiretap. (Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937)). Since that

time, Section 47 U.S.C. 605 has made its way to our highest tribunal a half a dozen times. It has been this statute, and the decisions based upon the statute, which has dictated the law in this matter, * * * not the Constitution.

However, in leaving the question of protecting the conversation and entering into the question of protecting the individual against official coercion, we reopen the constitutional doors to possible Fifth and Fourteenth Amendment attacks. In the case at bar, the Court has not found a significant deprivation of liberty, and thus has based this decision upon the statute. However, in considering this problem, the Court has not been unmindful of the reintroduction of constitutional elements into the field of wiretapping.[3]

(B) The Pre-*Rathbun* Conflict; Is Evidence Admissible if it is Obtained by Recording or by Listening to a Telephone Conversation with the Consent of One Party, but without the Knowledge or Consent of the Other?

In the twenty years which followed the enactment of the statute, there began to appear in the federal courts a number of cases which were not precisely wiretaps. They did not involve the clandestine interjection of a device into a wire, unbeknownst to either party. Rather, this new type of case involved facts similar to

---

1. Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928).

2. H.R. 4189, 71st Cong., 1st Sess. (1929); H.R. 5416, 71st Cong., 1st Sess. (1929); S. 6061, 71st Cong., 3d Sess. (1931); H.R. 23, 72d Cong., 1st Sess. (1932); H.R. 5305, 72d Cong., 1st Sess. (1932); H.R. 9893, 72d Cong., 1st Sess. (1932); S. 1396, 72d Cong., 1st Sess. (1932).

3. Lisenba v. People of the State of California, 314 U.S. 219, 62 S.Ct. 280, 86 L. Ed. 166 (1941); coerced confession, "The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence whether true or false. * * * As applied to a criminal trial, denial of

due process is the failure to observe that fundamental fairness essential to the very concept of justice."
That the uncoerced party to the conversation would have standing to raise the question is debatable, but his position can be analogized to the uncoerced party who is implicated by evidence uncovered after the police force the co-owner of his premises to consent to a search of mutually owned property. See Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1920), consent of wife coerced; Williams v. United States, 105 U.S.App.D.C. 41, 263 F.2d 487 (1959), consent of sister coerced. And see: Authority to Consent for Another to Search or Seizure, 31 A.L.R.2d 1078 (1953).

the case at bar: official monitoring of an extension telephone with the knowledge and ostensibly with the authorization of one of the parties. The federal circuit courts split dramatically upon this issue.

The Second Circuit, through the eloquent pen of Judge Learned Hand, held that it was necessary for both parties to the communication to consent to its interception. United States v. Polakoff, (2d Cir.) 112 F.2d 888, 134 A.L.R. 607 (1940), and see Reitmeister v. Reitmeister, (2d Cir.) 162 F.2d 691 (1947). Other circuits concluded that consent of one of the parties was sufficient to authorize its interception,[4] and the matter remained unsettled.

Neither was the matter settled in this Circuit. In 1950, Judge Holtzoff held in United States v. Lewis, D.C., 87 F.Supp. 970, reversed on other grounds, 87 U.S. App.D.C. 274, 184 F.2d 394, 24 A.L.R.2d 881 (1950), that the recording of a telephone conversation with the consent of one of the parties to that conversation did not violate section 605; and in 1953 he reiterated this position in United States v. Sullivan, D.C., 116 F.Supp. 480, affirmed 95 U.S.App.D.C. 78, 219 F.2d 760 (1953), holding that section 605 did not apply to a law enforcement officer listening, with the consent of an informer, to a telephone conversation between the informer and defendant. In 1954, Judge Pine, while recognizing the *Lewis* and *Sullivan* cases, came to a contrary conclusion. In United States v. Stephenson, D.C., 121 F.Supp. 274, appeal dismissed, 96 U.S.App.D.C. 44, 223 F.2d 336

(1954), he held that an interception must have the consent of both parties. The Court of Appeals decided the three appeals on grounds other than that of authorization to intercept.[5] Thus, prior to 1957, the question was unresolved in this Circuit and throughout the United States.

(C) Rathbun and Its Antecedents; One Party Can Authorize the Police to Monitor a Telephone Conversation.

The resolution of this conflict was effected in 1957 by the decision of the Supreme Court in Rathbun v. United States, 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957), rehearing denied 355 U.S. 925, 78 S.Ct. 363, 2 L.Ed.2d 355.

The *Rathbun* case held that when one party has consented to allow a third person to overhear a telephone conversation, there has been no "interception". The incorporation of the element of consent into the interpretation of the word "interception" is particularly significant.

Over the years there have been different interpretations as to what constituted an "interception". Earlier decisions attempted a dictionary definition: "it does not ordinarily connote the obtaining of what is to be sent before, or at the moment, it leaves the possession of the proposed sender, or after, or at the moment, it comes into the possession of the intended receiver." Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942). Under this definition listening in the next room to the words of one of the parties to the conversation was not an interception of a wire

4. Rayson v. United States, (9th Cir.) 238 F.2d 160 (1956); Flanders v. United States, (6th Cir.) 222 F.2d 163 (1955); United States v. Bookie, (7th Cir.) 229 F.2d 130 (1956); United States v. Pierce, D.C., 124 F.Supp. 264 (1954), affirmed (6th Cir.) 224 F.2d 281 (1954); and United States v. White, (7th Cir.), 228 F.2d 832 (1956).

5. The *Lewis* case was reversed on other grounds, but the Court upheld the position that the recording with consent of only one part is permissible. The *Sul-*

*livan* case was affirmed; the court found the interception illegal: "Even if Bolen (informer) consented—and it is not clear that he did—to a policeman's listening to the telephone conversation, the defendant did not consent", but determined that the evidence obtained therefrom was not the "fruit of the poisonous tree." 95 U.S.App.D.C. at pg. 80, 219 F.2d at pg. 762.

The appeal from Judge Pine's order granting the motion to suppress was dismissed because the order was not a final disposition and was not appealable.

communication, since what was heard was heard before it was sent or after it was received and not during the period of transmission. However, it is very difficult to apply this standard to an extension phone situation. For to attempt to determine in this situation whether the police overheard the conversation on an extension, either before it was sent or after it was received, is to focus upon insubstantial legal niceties which are blind to the realities of the speed of electronic communication.

The inevitable next step in the definition of "interception" came from the Second Circuit in Reitmeister v. Reitmeister, supra, an opinion consciously aware of the *Goldman* definition. Here the court spoke more precisely to electronic realities:

"The message must be 'intercepted' by some mechanical interposition in the transmitting apparatus itself, for the message, though sent over the wire, is not immune from disclosure; but only the interjection of an independent receiving device between the lips of the sender and the ear of the receiver." (162 F.2d pg. 694)

This definition was echoed by the dissent in *Rathbun*, which called the communication a "legally insulated transmission of thought" (355 U.S. pg. 113, 78 S.Ct. 161).

■ However, such definition ignores the moral connotation of the word "intercept." The word itself implies a seizure, or a diverting of a course against one's will. (Webster's New Collegiate Dictionary, 7th ed., pg. 438), and thus would seem to apply only to an "authorized" reception. Moreover, the statute only forbids those interceptions not authorized by the sender.

Thus, *Rathbun* arrived at the conclusion that if one of the parties to the communication consented to its reception by a third party, there was no interception, and the interjection of devices and mechanism has become secondary to the question of consent.[6]

On its bare facts *Rathbun* is a limited holding. It was a case in which a Mr. Sparks, in anticipation that he would be receiving a threatening telephone call, requested the police to listen to the conversation on a regularly installed telephone connection in another room of the Sparks home. Certainly no serious question of the voluntary nature of the consent arose in that case.

Some may hold that *Rathbun* should be limited to the facts of that case. (Dissent in Ladrey v. Commission on Licensure to Practice, etc., 104 U.S.App.D.C. 239, 261 F.2d 68 (1958)). However, such has not been done. Numerous decisions flowing from and resting upon the *Rathbun* opinion have been cases in which the police were present at the location where the phone call was initiated.[7]

These cases are a logical extension of the *Rathbun* holding. Placed in historical context, *Rathbun* most surely purports to ratify the earlier lower court decisions which are cited in footnote 5 of that opinion (355 U.S. at pg. 109, 78 S.Ct. at pg. 162). Many of the cases there cited involved situations in which the police prompted the informer to place the phone call. Yet those interceptions were admissible. In view of the very strong language used in *Rathbun*, it is apparent that the Supreme Court sanctioned those cases. For the court there stated that "Each party to a telephone conversation takes the risk that the other party may have an extension telephone

---

6. For an excellent discussion on the various interpretations of "interception", see Bradley and Hogan, Wiretapping: From Nardone to Benanti and Rathbun, 46 Geo.L.J. (1958).

7. Williams v. United States (9th Cir.), 290 F.2d 451 (1961); United States v.

Williams (7th Cir.), 311 F.2d 721 (1963); Carnes v. United States, (5th Cir.), 295 F.2d 598 (1961); Hall v. United States (5th Cir.), 308 F.2d 266 (1962); Wilson v. United States (9th Cir.), 316 F.2d 212 (1963); Ferguson v. United States (10th Cir.), 307 F.2d 787 (1962).

and may allow another to overhear the conversation." (355 U.S. at pg. 111, 78 S.Ct. at pg. 164). The Court could not have been unaware of the import of this language.

## (D) *When is Authorization Voluntary?*

Thus interpreted, *Rathbun* does present serious questions of the voluntary nature of the consent. When the police are on the scene encouraging the informer to make his call, we are met with the problem of determining if the consent to monitor that call is voluntarily given. Conversely, we must determine what form of police pressure obviates that consent.

The pre-*Rathbun* cases ignored this problem. Those cases which suppressed the wire tap evidence did so on other grounds.[8] And those cases which allowed the evidence to be introduced often did so in spite of extensive police pressure, simply ignoring the question of whether the consent or authorization was voluntary.[9]

One early Supreme Court decision, however, did speak to the question of consent. This was the case of Weiss v. United States, 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298 (1939). Petitioner in the case at bar relies heavily on *Weiss* to support his position that an authorization to intercept which is given in hopes of obtaining official leniency is not authorization at all. It is cited by those cases in this Circuit which have found a lack of authorization. (United States v. Laughlin, D.C., 222 F.Supp. 264 (1963); United States v. Laughlin, D.C., 223 F.Supp. 623 (1963)). For this reason we take a close look at the *Weiss* decision.

It should be understood that the *Weiss* case concerns consent to "divulge" an interception. We are concerned with consent or authorization to "intercept". This difference is best illustrated by placing *Weiss* in its proper perspective. In 1937 the first *Nardone* decision came down. (Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937)). One of the questions there presented was this: Admitting that the conversation was intercepted in violation of the statute, should that interception be inadmissible as evidence? The court held that the statute not only prohibited wiretapping, but also that the statutory prohibition of divulgence forbade divulgence by giving evidence of the intercepted communication, in a federal court.

*Weiss* followed upon the heels of *Nardone*. The question there involved was whether or not the government could force an agreement to publish or disclose an intercepted communication. The interception was a secret wiretap and was unquestionably unauthorized: "The participants were ignorant of the interception of the messages and did not consent thereto." (308 U.S. p. 330, 60 S.Ct. p. 272).

Therefore, we would not reach the point which was ruled upon in the *Weiss* case unless we found that 1) Mr. Jones had not authorized the interception, and 2) Mr. Jones was, at the time he took the stand, being pressured to consent to divulge the intercepted message to the court. Such pressure is not involved in this case. No charge or sentence was pending against Jones when he took the stand. Indeed no charge or sentence was pending against Jones when he filled out

---

8. United States v. Polakoff, supra, each party to the conversation is a "sender". And see Reitmeister v. Reitmeister, supra, interjection of a device between sender and receiver.

9. Rayson v. United States (9th Cir.), 238 F.2d 160 (1956), informer arrested and "apparently" agreed to assist government; Flanders v. United States (6th Cir.), 222 F.2d 163 (1955), informer previously arrested, government "prevailed upon him" to place calls; United States v. Bookie (7th Cir.), 229 F.2d 130 (1956), defendant arrested in his store. While in store call came for him: "at the officer's direction" he answered holding receiver in such a position that officer could listen.

the affidavit supporting the warrants or even when he made his final phone call.

■ However, it is true, that both the interception and the divulgence must be authorized. We realize that pressure is pressure. If the state applies the thumbscrew, the point in time when the pressure is applied does not make the pressure less odious.[10]

Yet, in considering this problem, we are not merely concerned with the time element; we are concerned with the nature of the pressure. In *Weiss*, the government tapped a wire without the consent of either party. They then used the evidence obtained from the wiretap itself in order to force one of the parties to the conversation to become an informer, to turn states evidence, and to consent to the divulgence of the intercepted message. Thus the very pressure exerted was an illegal wiretap. The court held that the use of a wiretap for the purpose of pressuring a person to consent to the publication of that very wiretap is clearly against the intent of section 605. No such pressure and no such use of a wiretap are involved in the case at bar.

Yes, one sentence in *Weiss* does say that the authorization was involuntary because it was given "in hope of leniency", (pg. 330, 60 S.Ct. 269), but this must be read in context. This case is not a precedent to invalidate each and every such authorization simply because it might be motivated by hope of leniency. *Weiss* is a very limited holding and affords little guidance in the case at bar.

Since *Rathbun*, there have been two cases in this circuit which have spoken to the element of consent.[11] The first of these is *Ladrey* v. *Commission on Licensure to Practice*, supra. However, the discussion of the element of consent in *Ladrey* is inconclusive.[12]

The second post-*Rathbun* case in this District which deals with consent is United States v. Laughlin, which is really two related cases involving a series of opinions.

In the first Laughlin case (Criminal No. 599–63; United States v. Laughlin, D.C., 222 F.Supp. 264 (1963)), a perjury case, a mistrial was declared by Judge Youngdahl late in the proceedings. Midway in that case the court was presented with the statements of the informer that she was pending possible indictment and permitted the phone calls to be monitored because she felt she "had to."

---

10. And see United States v. Laughlin, D.C., 222 F.Supp. 264 (1963), "the timing of the consent does not go to the issue ·of whether it was voluntarily given" or not (pg. 269). However, this seems to imply that *Weiss* was a retrospective consent to an interception rather than a consent to a prospective divulgence.

11. In a third case, United States v. Barbour, D.C., 164 F.Supp. 893 (1958), a "special employee" of the narcotics squad, at the officer's direction, placed a telephone call which the officer monitored. This was not an interception. However, consent was not specifically discussed by the court.

12. In *Ladrey*, the informant was one Matthews, who had told the appellant (a doctor) of the pregnancy of a woman and who arranged to bring the woman to the doctor's office, whereupon an abortion was attempted, and the woman died. Matthews, clearly implicated, had given a statement to officers of the homicide squad at police headquarters, and then, while still at headquarters, with the officer on an extension phone, he called the doctor and obtained the incriminating statements. This was held to be no interception.

The court averred to the defendant's position that the authorization to listen to the phone call was coerced. However, the court did not precisely respond to that position. Rather they shifted their position to emphasize the risk of disclosure inherent in the use of a telephone. Thus, having raised the question: "was there true consent?", the court responded by saying "the defendant, when he uses a telephone, takes the risk that it will be overheard." True! But only true in part. The question remains: Is he forced to take the risk that his conversation will be overheard by someone not authorized to overhear it?

With this before the court, the evidence was admitted. However, at a later point in the trial the court was presented with overwhelming evidence that the authorization to monitor the phone calls was obtained only through threats of prosecution on the part of the Assistant United States Attorney and the foreman of the grand jury. Even in the face of this pressure the authorization was given most reluctantly and only after much protest. With this new evidence before him, the court declared a mistrial on the grounds that the monitored conversations were obtained without the consent of either party to the conversations and should not have been admitted. Subsequently, Judge Curran dismissed the indictment on the same grounds. United States v. Laughlin, D.C., 223 F.Supp. 623 (1963). The motion to vacate the order to dismiss was denied. United States v. Laughlin, D.C., 226 F.Supp. 112 (1964). The appeal was dismissed without comment by order on April 8, 1964.

The second Laughlin matter was a conspiracy case, Criminal No. 600–63 (Laughlin v. United States, 120 U.S.App. D.C. 93, 344 F.2d 187 (1965)).

"In the trial of this case, Laughlin contended that under the doctrine of collateral estoppel the Government should have been precluded from relitigating the question of whether Mrs. Gross' consent to the making

of the recordings was coerced. The trial court rejected this contention, found that Mrs. Gross' consent was freely given, and admitted the recordings into evidence." (pg. 189).

The appellate court reversed on the grounds of collateral estoppel. Thus, the appellate court for this Circuit has not, as yet, reached the issue of the nature of consent.

Post-*Rathbun* decisions in other circuits have generally continued in the tradition of permitting the interception but ignoring the question of consent.[13] However, in recent cases some courts have begun to examine the nature of the consent necessary to authorize the interception. These courts have tended to permit the interception in spite of some police pressures, if those pressures are not "coercive."[14]

### III. *Legal Authorization Exists Where There is No Police Pressure.*

■ The nature of true consent is a philosophical question as polemical as the arguments concerning free will and determinism. However, this Court will limit its interrogation to the question most pertinent to this problem: Is the authorization involuntary if it is given in hope of leniency?[15] This Court holds that it is not.

---

13. Williams v. United States (9th Cir.), 290 F.2d 451 (1961), informer had personal grudges against the defendant; Ferguson v. United States (10th Cir.), 307 F.2d 787 (1962), informer was a prostitute; Wilson v. United States (9th Cir.), 316 F.2d 212 (1963), informer a special employee of the F. B. I.; Hall v. United States (5th Cir.), 308 F.2d 266 (1962), informer had dealt with the defendant (bootlegger) several times in the past; Carnes v. United States (5th Cir.), 295 F.2d 598 (1962).

14. United States ex rel. Dixon v. Pate, 7 Cir., 330 F.2d 126 (1964), informer a narcotics addict arrested and in custody; and McClure v. United States (9th Cir.), 332 F.2d 19 (1965), informer arrested and agents promised to ask U.

S. Attorney not to prosecute. In both cases the courts permitted the interception and specifically found authorization.

15. The two corollary questions would be: (1) Is the authorization involuntary if it is given as a result of an official promise of leniency? (see United States v. Laughlin, D.C., 222 F.Supp. 264, 269). "Promise of leniency distinguishes this case." (at pg. 269). (2) Is the authorization involuntary if it is given only as a result of a "coercive practice"? See United States ex rel. Dixon v. Pate, supra. Informer a narcotic addict under arrest; however, there was "no suggestion of record that coercive practices were employed against Mrs. Nitti." (330 F.2d at pg. 128).

We can think of no time in which a party to a telephone conversation would permit the police to intercept that conversation when he, himself, would not seek something from the police in return, assuming he is of sound mind and knows the police are police. He might merely be seeking police protection from threatening phone calls. Or, he might be an undercover policeman who seeks his pay check. Or, indeed, he may be seeking leniency. However, so long as pressure is not initiated by the police for the purposes of overbearing the will of the party, this Court does not believe that the authorization given by the party is involuntary.

In so holding, this Court still seeks to protect the conversation, and to protect the parties to the conversation. The Court would restrain the use of police coercion and of promises of leniency; and we would restrain the arm of the law from extending out into the community in search of the weak and the vulnerable who might be persuaded to authorize official monitoring of their telephone lines. We believe that the same strict standards which are required in order to validate a consent to a search and seizure should apply to a consent to intercept a telephone conversation.[16]

However, it needs no political philosopher to discern that the prospect of Big Brother is absent from the case at bar. There is less pressure in the present case than in almost every case reviewed. This smacks of no police state! Indeed, the circumspect and thoughtful steps followed by both the police and the Assistant United States Attorney not only are indicative of an awareness of the state of the law in this matter, but also reveal a feeling for the sensitive role which both parties are called upon to assume in a free society. No threats were made or implied; yet in other cases such implications were frequent. No promises of leniency were given, yet in other cases promises of leniency were given without hesitation. (See footnotes 9 and 11–13). Moreover, the informer here placed one phone call and swore to the affidavits after the sentence had been imposed. We need not reiterate the facts of this case. We do not find that the consent to intercept these telephone conversations was obtained by coercion.

## IV. A Final Note: Recording the Conversation Does Not Invalidate the Interception

One final note should be added. These conversations were recorded, and, although ahey have not been offered into evidence, they have been "divulged" simply by being turned over to the police. Reitmeister v. Reitmeister, supra. There has been some thought in this Circuit that the recording itself invalidates the interception. United States v. *Laughlin,* D.C., 223 F.Supp. 623, 626 (1963). In conflict with decision, this Court does not believe that, since *Rathbun,* recording the conversation makes the interception illegal.

Prior to *Rathbun* the question of the propriety of clandestinely recording the conversation and the admissibility of evidence obtained by such a recording was a topic of serious debate. United States v. Polakoff, supra, Reitmeister v. Reitmeister, supra, and United States v. Stephenson, supra. However, since the *Rathbun* decision permitted one party to authorize the police to monitor a telephone conversation on an extension phone, the propriety of recording that conversation is rarely questioned. Carnes v. United States, supra, concisely summarized the present state of the law:

"Two major principles may be extracted * * *. First, testimony as to a telephone conversation listened to with the consent of only one

---

16. Judd v. United States, 89 U.S.App. D.C. 64, 190 F.2d 649, (1951) and see Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); Williams v. United States, 105 U.S.App.D.C. 41, 263 F.2d 487 (1959) and Higgins v. United States, 93 U.S.App.D.C. 340, 209 F.2d 819 (1954).

of the parties to the conversation is not inadmissible under Section 605. Second, such testimony does not become inadmissible simply because it was recorded by an electrical or mechanical device attached to an extension phone or telephone wiring at the locality of the consenting party. * * * Taking a sensible view of it, the only difference between a person testifying to a conversation which he participated in or overheard and a recording of a conversation is that the recording has the advantage of furnishing trustworthy evidence (assuming a showing that the tape has not been tampered with). * * * This risk does not catch people by surprise, it does not substantially increase the risk to allow the conversation to be recorded or to allow others to listen."

And see Hall v. United States, supra; Ferguson v. United States, supra.

This, of course, does not sanction those recordings which are taken without the authorization of either party to the conversation. See United States v. Laughlin, D.C., 222 F.Supp. 264, (1963). Nor does it circumvent those sanctions which might be imposed upon those who record conversations without interjecting the proper tone signal. These signals, oddly enough, are not required either by statute or by regulations of the Federal Communications Commission, but are one of the conditions prerequisite to approval of the tariff schedules required to be filed with the F.C.C. and the local public utilities commissions. It has not been suggested that a violation of the condition precludes the introduction of evidence so obtained.

## V. *The Court's Ruling*

The Court finds that in the present case the informant properly authorized the police to overhear his telephone conversations, in full accordance with the provisions of 47 U.S.C. 605.

The motion to suppress is denied.

Appropriate order to be submitted by the Government.