**UNITED STATES of America**

v.

**Anthony ACAVINO et al.**

**Crim. A. No. 78–301.**

United States District Court,
E. D. Pennsylvania.

Feb. 18, 1979.

Robert F. Simone, Philadelphia, Pa., for Anthony Acavino.

Joseph F. Busacca, Philadelphia, Pa., for Frank Damiano.

Michael A. Seidman, Philadelphia, Pa., for Vincent Gangemi, Sr.

William T. Cannon, Philadelphia, Pa., for Francis Sweeny.

Donald C. Marino, Philadelphia, Pa., for Thomas Aufierio.

Joel H. Slomsky, Philadelphia, Pa., for Vincent Gangemi, Jr.

Thomas J. McBride, Asst. U. S. Atty., for United States.

POLLAK, District Judge.

Defendant Vincent Gangemi, Jr., has submitted three motions in which the other defendants in this criminal case have joined: (1) a motion to suppress tape recordings; (2) a motion to suppress all evidence obtained as a result of a search of the premises at 1717 S. 11th Street, Philadelphia, conducted by agents of the Drug Enforcement Administration on July 17, 1978; and (3) a motion for a severance and separate trial. An evidentiary hearing was held. For the reasons set forth below, the motions are denied.

## I.

The motion to suppress tape recordings is grounded on the decision in *United States v. Starks*, 515 F.2d 112, 121 n. 11 (3d Cir. 1975). The Court of Appeals there adopted the rule of *United States v. McKeever*, 169 F.Supp. 426, 430 (S.D.N.Y. 1958), requiring the Government to establish seven facts before a sound recording can be admitted into evidence:

(1) That the recording device was capable of taking the conversation now offered in evidence.

(2) That the operator of the device was competent to operate the device.

(3) That the recording is authentic and correct.

(4) That changes, additions or deletions have not been made in the recording.

(5) That the recording had been preserved in a manner that is shown to the court.

(6) That the speakers are identified.

(7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

The evidence adduced at the hearing showed, that beginning in May, 1978, twen-

ty-two tapes were made, recording some thirty conversations between Michael Marrazzo, a Government informant, and defendants Anthony Acavino and Frank Damiano: (1) Seven tapes are of conversations initiated by Marrazzo from various public telephone booths; the conversations were monitored by Agent William Kean of the Drug Enforcement Administration Task Force, using a portable tape recorder and induction coil. Agent Kean sealed these tapes in a plastic envelope, which he initialed and locked in a safe in his office. (2) Fourteen tapes are of conversations on Marrazzo's own telephone at home; they were made by Marrazzo on a recording machine supplied to him by Agent Kean. Marrazzo stored these tapes in a floor safe before turning them over to Agent Kean or Agent Ellis M. Hershowitz for safekeeping. (3) One tape was made using a body recorder placed on Marrazzo by Agent Kean. The body recorder was kept intact and returned to Agent Kean's office.

Defendants do not dispute that the Government has met its burden on the first six elements of the *Starks* test: the recording devices were adequate to their tasks; the operators were competent; the tapes were authentic and unaltered; the chain of custody was unbroken; and the speakers were identified. But, defendants insist that Marrazzo's cooperation in the making of the tapes was obtained by Government assurances to Marrazzo of immunity from parole revocation and prosecution; and it follows, so defendants argue, that none of "the conversation[s] elicited was made voluntarily and in good faith, without any kind of inducement," within the meaning of the seventh element of *Starks*.[1]

Marrazzo's decision to cooperate with the Government in conducting and recording conversations with certain of the defendants followed an initial approach to Marrazzo by Agent Kean, who solicited Marrazzo's assistance. The context of Marrazzo's deci-

sion to cooperate emerges from Marrazzo's testimony:

Q. You got involved in some difficulty with the law at that time, didn't you, sir?

A. Yes.

Q. Now, I understand that you were on Federal parole in March or April 1978. Is that right?

A. Yes.

Q. How much time did you have left to serve on that parole period?

A. I had until September.

Q. And do you know what kind of time you faced if your parole had been revoked?

A. Yes.

Q. How much time, sir?

A. I had an additional seven years plus whatever they would give me at the new trial.

Q. Now, you are cooperating with the Government in this case. You placed telephone calls to help yourself, didn't you, sir?

A. Yes.

\* \* \* \* \* \*

Q. Now, do I take it, sir, that you wanted some assurance at that time before you placed the first call from Agent Kean that he could help you in some way? Is that correct?

A. Right.

Q. And would have had great difficulty or hesitancy in placing that first call if he couldn't give you any assurance. Is that correct?

A. That's true.

Q. In fact, you wouldn't have placed that first call on May 8, 1978, unless you had some assurance from Agent Kean. Isn't that correct?

A. That's true.

Q. And that's true with respect to the second call?

---

1. See Section 802 of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2511(2)(c) which provides:

It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

A. No, because prior to the first call he took me to meet with [Assistant United States Attorney] McBride.

Q. So you had your assurance at that point?

A. Yes.

Q. Then you placed the first call?

A. Correct.

The Court of Appeals for this Circuit has recently considered consensual recording of telephone and other conversations in *United States v. Moskow,* 588 F.2d 882 (3 Cir. 1978). There, one Wadley was caught in the act and arrested for arson; at police headquarters he confessed his guilt and implicated defendant Moskow. Soon after his release on bail, Wadley was again approached by Moskow with a new arson scheme. On his own initiative, Wadley contacted the authorities, and arrangements were made for electronic monitoring of his telephone and face-to-face contacts with Moskow. The tapes of those conversations were admitted into evidence at Moskow's trial. On appeal, the Court of Appeals found that Wadley's consent was voluntarily obtained: "Obviously, Wadley did expect continued favorable treatment as a result of his agreement to cooperate, but this consideration did not render his consent involuntary." *Id.* at 891. Six other Courts of Appeals have also ruled that a person's consent to recording and transcription of his conversations is not rendered involuntary because his cooperation has been obtained in return for a promise of lenient treatment. *United States v. Gladney,* 563 F.2d 491 (1st Cir. 1977); *United States v. Silva,* 449 F.2d 145 (1st Cir. 1971);

*United States v. Bonanno,* 487 F.2d 654 (2d Cir. 1973); *United States v. Dowdy,* 479 F.2d 213 (4th Cir. 1973); *United States v. Franks,* 511 F.2d 25 (6th Cir. 1975); *United States v. Hodge,* 539 F.2d 898 (6th Cir. 1976); *Good v. United States,* 378 F.2d 934 (9th Cir. 1967); *United States v. Ryan,* 548 F.2d 782 (9th Cir. 1976); *United States v. Baker,* 139 U.S.App.D.C. 126, 430 F.2d 499 (1970); *United States v. Jones,* 140 U.S. App.D.C. 70, 433 F.2d 1176 (1970).[2] In the instant case, what Agent Kean and Assistant United States Attorney McBride did was to offer Marrazzo certain assurances that the Government was in fact prepared to follow through on, and but for which Marrazzo "wouldn't have placed that first call on May 8, 1978." But the fact that the assurances were the quid for the quo of Marrazzo's cooperation does not, without more, make the transaction between the Government and Marrazzo an instance of over-reaching prohibited by *Starks.* Judicial inquiry is confined to the question "whether the consent was voluntary and uncoerced, not whether the motivations for it were altruistic or self-seeking." *United States v. Osser,* 483 F.2d 727, 730 (3d Cir. 1973). The threat or promise which may void a confession does not automatically stamp the monitoring of a conversation as unconsented to. For, in the prevailing view, "[r]equiring [an informant] to face up to the real world in order to obtain his cooperation . . . is permissible under our system." *United States v. Ryan,* 548 F.2d 782, 790 (9th Cir. 1976).[3]

**2.** It is common to quote Judge Walsh's observation in *United States v. Zarkin,* 250 F.Supp. 728, 737 (D.D.C.1966) that "[w]e can think of no time in which a party to a telephone [call] would permit the police to intercept that conversation when he, himself, would not seek something from the police in return, assuming he is of sound mind and knows the police are the police." But see *United States v. Baynes,* 400 F.Supp. 285 (E.D.Pa.1975) (informant came to police unsolicited to help them control drug traffic which he considered a threat to young Blacks.)

**3.** Judge Hufstedler has voiced a dissenting view: she would use Fifth Amendment standards of voluntariness, as developed in coerced

confession cases, as the touchstone of whether X has effectively consented to the recording of a conversation with Y so as to render the conversation admissible against Y. See *United States v. Ryan, supra,* at 792–95; cf. Invisible Searches for Intangible Things: Regulation of Governmental Information Gathering, Address by Judge Shirley M. Hufstedler, Owen Roberts Lecture, University of Pennsylvania (October 17, 1978). Compare *United States v. White,* 401 U.S. 745, 749–54, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), and the dissenting opinion of Harlan, J., *id.* at 769 n. 1, 91 S.Ct. 1122; and see also, *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973).

The difference between *Moskow* and the instant case is that, here, as is generally not the case, the Government sought out the potential informant, not vice-versa. The Court of Appeals' reference, in *Moskow,* to the late Judge Youngdahl's thoughtful disposition of *United States v. Laughlin,* 222 F.Supp. 264 (D.C.1963), may be taken as enjoining on trial judges a heightened degree of caution when the Government initiates the bargaining;[4] but it would not seem to be authority for a *per se* foreclosure of a finding of voluntariness when the Government is the initiating offeror of the bargained-for assurances.

## II.

■ Defendants' second motion seeks to exclude evidence obtained as a result of a search of the premises at 1717 S. 11th Street, Philadelphia, conducted on July 17, 1978. Defendants argue that the search was not executed in accordance with the requirements of the search warrant issued by Magistrate Peter B. Scuderi in that the Government did not "bring the property before [Magistrate] Scuderi" as the warrant "commanded."[5] Rule 41(d) of the Federal Rules of Criminal Procedure, which governs the execution of search warrants, requires only that "[t]he return shall be made promptly and shall be accompanied by a written inventory of any property taken," not that the property, itself, be brought before the Magistrate. Here, the agents who conducted the search returned the warrant to Magistrate Scuderi with an inventory of the property seized on the back of the warrant. Failure to follow the more exacting commands of the warrant did not prejudice the defendants' right to be free from

unreasonable searches and seizures and does not require suppression. Cf. *United States v. Hall,* 505 F.2d 961 (3d Cir. 1974); *United States v. Hooker,* D.C., 418 F.Supp. 476, 483–84, affirmed, 547 F.2d 1165 (3d Cir. 1976).

■ Defendants have also argued that there was not probable cause for the issuance of the warrant. The Government submitted a detailed affidavit to the Magistrate, containing facts which were sufficient "to warrant a man of reasonable caution in the belief" that an offense was about to be committed. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). And to the extent the affidavit relied on information provided by a confidential informant, the requirements of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), were clearly satisfied.

## III.

### A.

■ Defendant Gangemi, Jr.'s severance motion alleges that he will be substantially prejudiced by a joint trial. Specifically, he argues (1) that joinder will permit the introduction of his co-defendants' statements in a form not subject to cross-examination should his co-defendants choose not to take the witness stand; (2) that joinder will permit the introduction of certain evidence admissible against his co-defendants, but inadmissible as to him; (3) that joinder will prevent him from subpoenaing his co-defendants, "who well might be the only witnesses who can prove his innocence;" and, (4) that joinder is undesirable because "[his]

4. What Judge Youngdahl properly condemned in *United States v. Laughlin* was the concurrent action of an Assistant United States Attorney and the deputy foreman of a federal grand jury, in the grand jury room, of threatening a woman with a perjury indictment if she did not initiate telephone conversations which were to be monitored by federal agents, with a view to prosecuting the other parties to the conversations.

5. The warrant reads, in relevant part:

You are hereby commanded to search within a period of two (2) days (not to exceed 10 days) the person or place named for the property specified, serving this warrant and making the search in the daytime (6:00 a. m. to 10:00 p. m.) and if the property be found there to seize it, leaving a copy of this warrant and receipt for the property taken, and prepare a written inventory of the property seized and promptly return this warrant and bring the property before PETER B. SCUDERI as required by law.

defense may be antagonistic to the defense of other defendants."

A defendant seeking a separate trial, where joinder is proper under Rule 8 of the Federal Rules of Criminal Procedure, has the burden of showing the prejudice that will result from a joint trial. *United States v. Lipowitz,* 407 F.2d 597, 601 n. 15 (3d Cir. 1969); F.R.Crim.P. 14. The mere possibility that in a joint trial some evidence may be admissible against one defendant which is inadmissible against another does not overcome the considerations of judicial economy that weigh in favor of multiple-defendant trials. *United States v. Kenny,* 462 F.2d 1205, 1218 (3d Cir. 1972). Similarly, a bare assertion that a severance will permit a co-defendant to give exculpatory testimony does not compel separate trials. *United States v. Boscia,* 573 F.2d 827, 832 (3d Cir. 1978).[6] And a severance is not required merely because defendants have inconsistent interests; "it must be demonstrated that a conflict is so prejudicial that differences are irreconcilable, and 'that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty'." *United States v. Robinson,* 139 U.S.App.D.C. 286, 289, 432 F.2d 1348, 1351 (1970), quoting *Rhone v. United States,* 125 U.S.App.D.C. 47, 48, 365 F.2d 980, 981 (1966). Accord, *United States v. Samuels,* 374 F.Supp. 684, 686–87 (E.D.Pa. 1974).

There remains for consideration the claim that a joint trial will permit the introduction of co-defendants' statements in a form not subject to cross-examination. That claim is bottomed on the Supreme Court's decision in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), where the Court held that admission at a joint trial of a co-defendant's extrajudicial inculpating statements violated the defendant's right of cross-examination secured by the confrontation clause of the Sixth Amendment. But remedial steps short of severance are available to cure the problem, should a problem exist: It will be the Government's responsibility to make any redactions necessary to insure that none of the defendants is denied his confrontation rights. See *United States v. Diglio,* 538 F.2d 972, 981–83 (3d Cir. 1976); *United States v. Belle,* 593 F.2d 487 (3d Cir. 1979).

**6.** By letter dated December 27, 1978, counsel for Vincent Gangemi, Sr., has argued that his client has special claim to a severance:

The "case" agent, Mr. Kean, testified that my client is not mentioned either directly or by nickname in any of the six to eight hours of tapes involved in this case. The testimony also revealed that my client's alleged participation was his presence in the house on the day of the seizure and his accompanying his son (co-defendant Vincent Gangemi, Jr.) to New Jersey where alleged paraphernalia was purchased. My client's son may very well testify on behalf of his father at a separate trial. Although the cases seem to indicate that severance is discretionary and will not be reversed absent an abuse of that discretion, I believe that this case deserves consideration. Here, unlike any cases I have been able to find, there is a father and a son involved so that the likelihood of testimony (and exculpatory testimony at that) is a very distinct possibility.

*Boscia, supra,* however, makes clear that a bare assertion that a co-defendant may testify is insufficient, especially where there is no showing as to the content of the expected testimony. 573 F.2d at 832. Accord, *United States v. Rosa,* 560 F.2d 149 (3d Cir. 1977) (*en banc*).