UNITED STATES of America

v.

William Daniel HOOKER.

Crim. No. 76–7.

United States District Court,
M. D. Pennsylvania.

July 28, 1976.

David Dart Queen, Asst. U. S. Atty., Harrisburg, Pa., for plaintiff.

Arthur Kusic, Harrisburg, Pa., for defendant.

MEMORANDUM AND ORDER

NEALON, District Judge.

On February 26, 1976, after a four-day trial, defendant, William Daniel Hooker,

was found guilty by a jury of two counts of bank robbery in violation of 18 U.S.C. §§ 2, 2113(a) and 18 U.S.C. §§ 2, 2113(d). Defendant's motion for judgment of acquittal,[1] or for a new trial, is now before the Court.

In his brief and at oral argument, defendant asserted the following grounds in support of his motion: (1) the evidence was insufficient as a matter of law to sustain the conviction and his motion for judgment of acquittal at the close of all the evidence should have been granted; (2) that he was denied counsel at a bail reduction hearing before United States Magistrate Sebastian Natale in violation of his constitutional rights under the 6th Amendment and Rule 44(a) of the Federal Rules of Criminal Procedure; (3) that the Court erred in allowing into evidence items taken from 581 Gunpowder Road, White Marsh, Maryland, as a result of an illegal search and seizure; (4) that the Court erred in allowing into evidence a slip of paper containing the entry "$6,566.00" and allegedly bearing defendant's fingerprints, which was not included in the written inventory filed with the Magistrate pursuant to Rule 41(d) of the Federal Rules of Criminal Procedure; and (5) that the Court erred in allowing in-court identifications of the defendant which were the result of an impermissibly suggestive pretrial photographic display.

### INSUFFICIENCY OF EVIDENCE

Addressing first the motion for judgment of acquittal, the jury verdict must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it. *United States v. Pratt,* 429 F.2d 690 (3rd Cir. 1970); *United States v. Giuliano,* 263 F.2d 582 (3rd Cir. 1959). Viewed in that light, the following facts appear.

On December 2, 1975, defendant was the owner of a 1976 Chevrolet pickup truck, maroon and white, with two CB antennas, a white camper top, 5-point magnesium wheel covers, South Carolina license tags (white numbers and letters on a red background) with a dealer sticker entitled "Jerry's" on the tailgate. On that day, at approximately 9:15 A.M., John Richards, a Chevrolet dealer in the small town of New Freedom, Pennsylvania, observed a Chevrolet pickup truck with similar characteristics, including the name "Jerry's" on the tailgate, drive by his place of business and it attracted his attention because he knew "it was a truck that I hadn't sold." There were two occupants in the truck and Richards identified the passenger as the defendant, having looked at him for 5 to 10 seconds. He saw the truck, with defendant as an occupant, cruising the area at different intervals until shortly before noon. The Commonwealth National Bank in New Freedom is located "a couple of small short city blocks" from his place of business. At approximately 10:30 A.M., a small truck with a topper on it pulled alongside the car in which Mrs. Patricia Myers was seated and inquired whether there was a police barracks in town. Mrs. Myers identified the passenger as the defendant. Two municipal employees in a truck were passing by at that time and noticed the pickup truck in front of the Myers home. Both employees identified a photograph of defendant's truck as the same vehicle they saw that day. Sometime in the morning, a white male entered the bank and requested a $5.00 blank money order[2] from Susan Kurtz, a teller. She believed he was acting strangely, i. e., leaning over her counter and looking all around when she left her post to type up the money order. Her suspicions aroused, she went to the front window after he left and saw him enter the driver's side[3] of a red and maroon truck with a camper on top which she iden-

---

1. While defendant has styled his motion as one for a new trial only, he did assign as a reason the denial of his motion for acquittal made at the conclusion of the evidence. Therefore, this reason will be treated as a motion for judgment of acquittal.

2. The $5.00 money order was never cashed.

3. This man was not the defendant who was identified by other witnesses as being seated on the passenger side.

tified as similar to the defendant's truck. At approximately noon, Mrs. Ann Meshey, who resides 1.7 miles from the bank, observed defendant's truck, occupied only by the driver, pull away from a parking lot across from her home, stop a short distance away, and wait for a car to emerge from the same parking lot and then follow this car down the highway. She described the car as a light blue or light green sedan perhaps 3 or 4 years old.[4] At 1:13 P.M. two armed white males wearing ski masks and latex gloves and displaying handguns rushed into the bank, trained the weapons on the two tellers and two bank customers, and ordered the tellers to place money from their cash drawers into a brown shopping bag. One of the robbers was 5'6" tall, about the same height as the man who purchased the $5.00 money order. The other man was described as approximately 5'10" or 5'11" tall[5] with a brown ski cap with a white circle around it pulled over his face, and wearing a gray hooded sweatshirt and latex gloves. The taller man held one of the customers with a gun in her back after announcing "this is a holdup, don't anybody move." The tellers placed $16,027.00 in the bag including $1,500 "bait money".[6] As the robbers ran out of the bank, the two customers rushed to the window and observed the men get into a light green Ford Galaxy automobile, Pennsylvania license No. N 75036. See footnote 4. This car was later found abandoned .1 to .2 of a mile from the bank. The following day, December 3, 1975, at noon, defendant went to the Woodshade Apartments, Baltimore, Maryland, from which he had recently been evicted and his furniture confiscated for nonpayment of rent, and told the manager that he had several hundred dollars "to pay all of his back rent, get his furniture out of hock, and have a month's rent in advance on a new apartment."[7] Acting on information received, Special Agents of the F.B.I. obtained a search warrant for the premises at 581 Gunpowder Road, White Marsh, Maryland, the t, Maryland, the temporary residence of Judy Osborne, allegedly defendant's paramour, and conducted a search at 5:09 P.M., December 3, 1975. Above a dropped ceiling panel in the hallway, they found $6,386.00, including $500 bait money, wrapped in a white sheet of paper containing the notation "$6,566.00" and enclosed with a rubberband, all of which had been placed in a brown ski cap with a white circle around it and the end of the cap was tied shut. In addition, among items on the living room floor which Mr. Wiley Hall, a resident, described as belonging to defendant, they found a grocery bag marked "EZ" shopping center and a sack containing a gray hooded sweatshirt[8] with a pair of latex gloves. Mr. Ralph Brown, a fingerprint specialist for the F.B.I., identified defendant's fingerprints and palm prints on the white sheet of paper which was wrapped around the money and also on the shopping bag. Photographs taken by the Bank's surveillance camera showed the designation "EZ" on the bag in which the robbers placed the money. The photographs also revealed that the taller robber wore a dark ski cap with a white circle around it over his face and also wore a light hooded sweatshirt and latex gloves.

---

4. The car used in the bank robbery was a 1968 light green Ford Galaxy bearing Pennsylvania license No. N 75036. This automobile had been stolen that day from the parking lot across from Mrs. Meshey's home.

5. The two customers, Ann Shadis and Jane Higgenbotham, *told the police originally that the second man was 5'7" or 5'8" tall*, having reasoned that each was 5'5" tall and he was 2 to 3 inches taller than they. At the trial, they corrected their original estimate because they had not previously considered the fact that each was wearing high-heeled boots which made each one's height to be 5'8". Defendant is about 6' tall.

6. The serial numbers of bait money are kept in the bank and the money is placed in a teller's cash drawer solely for evidentiary purposes in the event of a robbery and is not used in any bank transactions.

7. In commenting on the confiscation of his furniture, defendant told the manager " . . . you're giving me a heck of a birthday present." Defendant was born December 3, 1947.

8. Defense witness William Hatch admitted having previously seen defendant wearing the gray hooded sweatshirt.

It is obvious from the above recitation of facts that the evidence implicating defendant was not only substantial, it was overwhelming. Therefore, defendant's motion for judgment of acquittal will be denied.

## APPOINTMENT OF COUNSEL

Defendant surrendered to federal authorities in Baltimore, Maryland, on December 4, 1975, and was brought before an United States Magistrate where, after being advised of the charges against him and his right to counsel, defendant informed the Magistrate that he had private counsel, E. Thomas Maxwell, of the Baltimore bar. At this time, a Mr. Freedman, identified as Law Clerk to E. Thomas Maxwell, appeared on defendant's behalf. Bail was fixed at $300,000 and a preliminary examination scheduled for December 12, 1975. At the December 12th hearing, Mr. Maxwell appeared and represented defendant. At the conclusion of this hearing, the Magistrate determined that probable cause existed and he ordered defendant removed to this district. Bail was continued at $300,000. On December 17, 1975, defendant was brought before U.S. Magistrate Sebastian D. Natale in this district pursuant to his request for a reduction of bail. After considering defendant's request, the Magistrate reduced the bail to $200,000 and the defendant was committed to custody when he was unable to satisfy this bail requirement.

Defendant contends that he requested counsel at the bail reduction hearing but his request was denied. He now argues that he is entitled to a new trial as a result of the denial of this request because, if the request had been granted and counsel appointed, then counsel would have had more time to prepare the case and defendant would have been able to assist earlier in his defense. The record discloses that defendant was indicted on January 14, 1976, counsel was appointed on January 15th and the arraignment was held January 20th, at which time a trial date was fixed for February 23, 1976, more than five weeks after counsel's appointment.

It must be pointed out initially that defendant had counsel at his Preliminary Examination in Baltimore on December 12th, at which the Magistrate found that there was probable cause to believe that an offense had been committed by the defendant and ordered him removed to this district.[9] The hearing held before Magistrate Natale in this district was the result of defendant's request for reduction of bail. A bail reduction hearing is not a "critical stage" of the proceedings where the defense on the merits would be impaired without the assistance of counsel. *Gerstein v. Pugh*, 420 U.S. 103, 122, 95 S.Ct. 854 (1975); *United States ex rel. Reed v. Anderson*, 461 F.2d 739, 742 (3rd Cir. 1972). In *Gerstein v. Pugh, supra*, the Supreme Court held that the probable cause determination required by the Fourth Amendment is not a "critical stage" in the prosecution that would require appointed counsel. The court noted further that the Fourth Amendment probable cause determination is addressed only to pretrial custody. *Id.* at 123, 95 S.Ct. 854. A bail reduction hearing would similarly be addressed merely to pretrial custody and not to a pretrial procedure that would impair defense on the merits if the accused is required to proceed without counsel. *Id.* at 122, 95 S.Ct. 854. In any event, an illegal detention does not void a subsequent conviction. *Id.* at 119, 95 S.Ct. 854; *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952). Furthermore, even if the constitutional right to counsel were violated, there must be a showing of prejudice to justify the quashing of an indictment. *United States v. Hendrickson*, 417 F.2d 225 (3rd Cir. 1969); *McGill v. United States*, 121 U.S.App.D.C. 179, 348 F.2d 791 (1965). While Fed.R.Crim.P. Rule 44(a), 18 U.S.C.A. provides that a defendant unable to obtain counsel is entitled to have counsel at every stage of the proceedings from his initial appearance before the Magistrate, the fail-

---

**9.** Baltimore is less than 100 miles from New Freedom, Pa. *See* Fed.R.Crim.P. Rule 40(a), 18 U.S.C.A.

ure to provide counsel would not mandate a dismissal of the charges without a showing of prejudice. *See Williams v. United States*, 129 U.S.App.D.C. 332, 394 F.2d 957 (1968). To meet this burden, defendant argues that if counsel had been appointed at the bail reduction hearing (December 17, 1975), such counsel would have had 4 additional weeks to prepare for trial inasmuch as counsel was not appointed until January 14, 1976. Defense counsel did not particularize any prejudice of any nature either in his brief or at oral argument. Counsel had approximately 5½ weeks to prepare his case and the Court complied promptly with all of his pretrial requests. Defendant also had the benefit of both private counsel from at least December 4, 1975, some 2½ months prior to trial, and appointed counsel from January 14, 1976. There is clearly no showing of prejudice.

Even if the harmless error requirement of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), were to be applied to a bail reduction hearing following the preliminary hearing at which bail was fixed and where defendant was represented by counsel, I would still conclude that any constitutional error in this case was harmless beyond a reasonable doubt. *See Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970).

### SEARCH OF PREMISES AT 581 GUNPOWDER ROAD

The thrust of defendant's argument here is that the affidavit submitted in support of the application for a search warrant to the premises at 581 Gunpowder Road, White Marsh, Maryland, was inadequate.[10] The affidavit, executed by Special Agent David L. Parker of the Federal Bureau of Investigation provided:

"AFFIDAVIT

"UNITED STATES OF AMERICA, DISTRICT OF MARYLAND, ss.

"Before me personally appeared this date David L. Parker, Special Agent, Federal Bureau of Investigation, who being first duly sworn, deposes and says that:

"On December 2, 1975, the Commonwealth National Bank, FDIC insured, New Freedom Office, New Freedom, Pennsylvania, was robbed by two armed, masked white males of bank funds totaling $16,000 including prerecorded bait bills totaling $1,500, all in $50 bills.

"A composite description secured by Agents of the Federal Bureau of Investigation through interview of witnesses to this robbery is as follows:

"Robber #1

| | |
|---|---|
| Race: | White |
| Sex: | Male |
| Age: | 20 to 30 |
| Height: | Approximately 5′8″ |
| Weight: | 140 to 150 pounds |
| Wearing: | Black knit cap pulled over face as mask, waist length navy blue jacket |
| Carrying: | Handgun |

"Robber #2

| | |
|---|---|
| Race: | White |
| Sex: | Male |
| Age: | 20 to 30 |
| Height: | Approximately 5′8″ |
| Build: | Average |
| Wearing: | Dark ski cap pulled over face, gray sweatshirt, tan leather gloves, dark blue pants, light brown boots |
| Carrying: | Small automatic handgun |

"On December 2, 1975, John F. Richards, a resident of New Freedom, Pennsylvania, advised Special Agent George Delaney that he observed a 1975 to 1976 Chevrolet pickup truck, color red with white trim having a camper shell on the back, with a red and white license tag, and having the name Jerry's Chevrolet displayed on the rear. In addition, this vehicle had at least one CB antenna on the front fender. He observed this vehicle loitering in and about the village of New Freedom, Pennsylvania, and in the area of the Commonwealth National Bank, New Freedom, Pennsylvania, between the hours of 9:00 a.m., and 12:00 p.m., on December 2, 1975. Mr. Richards

---

10. A vague contention was also made that the Magistrate did not sign the search warrant before issuing it but the evidence, which the Court accepted, clearly established that it was signed prior to issuance.

paid particular attention to this vehicle and its occupants noting they were strangers in the village and seemed to have no purpose for being there. He stated that the vehicle was occupied by two white males on each time he observed it.

"On the same date, Mr. Richards positively identified the known photograph of William Daniel Hooker as being one of the occupants of this vehicle.

"A confidential informant who has provided information in the past and who has always been reliable advised Special Agent H. Thomas Moore that William Daniel Hooker was one of two white males who robbed the Northwestern Bank, Spruce Pine, North Carolina on 8/6/74 and the First National Bank of Sullivan County, Bristol, Tennessee on 9/4/74.

"A second confidential informant who has provided information in the past and who has always been reliable advised Special Agent H. Thomas Moore that Frank Kalita and William Hooker robbed the Ellis First National Bank, New Port Richey, Florida on 4/23/75 and the First Citizens Bank and Trust, Eastside Branch, Wilson, North Carolina on 7/18/75. Investigation by Special Agents of the Federal Bureau of Investigation at the banks in question revealed that in the bank robberies of 8/6/74 and 9/4/74 the two holdup men entered the bank wearing masks and displaying handguns. In the bank robberies of 4/23/75 and 7/18/75, one holdup man went into the bank while the other stayed outside. Frank Phillip Kalita, Jr. has been indicted in federal court for the robbery of the Ellis First National Bank, New Port Richey, Florida and the First Citizens Bank and Trust, Wilson, North Carolina.

"Frank Phillip Kalita, Jr. advised Special Agent Michael Hamlin that he is an associate of William Daniel Hooker. FBI investigation has determined that William Daniel Hooker was at one time employed by Frank Phillip Kalita, Jr.

"FBI identification record reflects that William Daniel Hooker was convicted of breaking and entering in 1968 and received 3 years to run consecutively with previous 3 year sentence received in Anne Arundel County; convicted in 1969 of burglary and carrying a concealed weapon and received 8 years; charged with possession of burglary tools and felony possession of marihuana in North Carolina in 1974 for which he received a fine.

"On September 30, 1975, Special Agents H. Thomas Moore, Michael E. Hamlin and Roger D. Kuhleman had occasion to view a 1976 Chevrolet pickup truck in possession of William Daniel Hooker, which was described as a red and white Chevrolet truck, serial number CCL146B103458. This vehicle at the time had a camper shell on the rear and inscription of Jerry's Chevrolet on the rear, and CB antennas on each fender.

"A third confidential informant who has provided reliable information in the past, advised Special Agent H. Thomas Moore that William Daniel Hooker was residing with his wife at 581 Gunpowder Road, Baltimore County, Md.

"On December 3, 1975, a 1976 Chevrolet truck, color red and white, bearing South Carolina dealer registration XPL 136, having a camper shell on the rear, was observed by Special Agent H. Thomas Moore parked at the residence known as 581 Gunpowder Road, Baltimore County, Maryland.

"The files of the Baltimore Office reflect William Daniel Hooker to be described as a white male, age 28, height 5'11", 165 pounds, and Frank Phillip Kalita, Jr. described as a white male, age 30, height 5'8", weight 148 pounds.

/s/ David L. Parker
Deponent's signature

"Subscribed and sworn to before me this third day of December, 1975.

/s/ Paul M. Rosenberg
United States Magistrate

A TRUE COPY. CERTIFIED THIS 15th day of December, 1975.

(signed) Paul M. Rosenberg
U. S. Magistrate"

**482**

■ Initially, the Government contends that defendant has no standing to challenge the search warrant because he (a) was not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory interest in the premises or the items seized; and (c) was not charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure. *Brown v. United States*, 411 U.S. 223, 229, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). It is clear that defendant was not on the premises at the time of the search and possession of the evidence seized here, including the money, is not an essential element of the crime of bank robbery under 18 U.S.C. § 2113(a) or (d). Finally, defendant never asserted any proprietary or possessory interest in the premises or in any of the items received in evidence, adopting instead the trial strategy that he had no connection with the premises or the items seized but that others properly on the premises had an interest in, and possession of, the damaging evidence found therein. Defense testimony was to the effect that Mr. and Mrs. William H. Hatch and their three children lived on the premises, having leased it from Mrs. Hatch's father, Salvatore Marciglia, and that Mr. and Mrs. Wiley O'Dell Hall, their two children, Mrs. Judy Osborne, defendant's girlfriend, and her child, were all houseguests at the time of the search. Mr. Hatch testified that he had known defendant for more than a year and that he came to the house frequently to visit Mrs. Osborne. Mr. Hall was called as a defense witness and identified the gray hooded sweatshirt and latex gloves as his and not defendant's. Mrs. Hatch described the piece of paper containing the notation "$6,566.00" as similar to paper from her notebook which she and her daughter used and which is left out on the table and available to anyone. (N.T. 396, 7) Consequently, defendant was portrayed as merely a friend of one of the houseguests, who came to the house for visiting purposes thereby challenging his access to the items seized and creating the impression that the property seized belonged to someone else. There is absolutely no evidence in this record depicting defendant as anything but a visitor to the premises searched. I conclude, therefore, that under the doctrine of *United States v. Brown, supra,* he lacks standing to challenge the search and seizure.

■ Assuming, arguendo, that defendant has standing, he fares no better on the merits. A fair reading of the affidavit would have enabled the Magistrate to conclude that defendant was a former employee and associate of Frank Phillip Kalita, Jr., who was under indictment for two bank robberies in Florida and North Carolina; that according to confidential informants who had provided reliable information in the past, defendant was involved in those bank robberies with Kalita in which the holdup men wore masks and displayed handguns; that defendant had a substantial criminal record involving convictions for breaking and entering in 1968, burglary and carrying a concealed weapon in 1969, and possession of burglary tools in 1974; that defendant was positively identified as a passenger in a red and white Chevrolet pickup truck, with a camper on the back and the inscription "Jerry's Chevrolet" on the rear, which was seen loitering in the vicinity of the Commonwealth National Bank, New Freedom, Pennsylvania, on the morning that the bank was robbed, *viz.*, December 2, 1975; that the bank was robbed by two white males, between 20 to 30 years of age, approximately 5'8" tall and of average build, wearing ski caps pulled over their faces and carrying handguns, who escaped with $16,000 including prerecorded bait bills totaling $1,500 all in $50 bills; that defendant was white, age 28, 5'11" tall and weighed 165 pounds while Kalita was also white, age 30, 5'8" tall and weighed 148 pounds; that on September 30, 1975, defendant was seen by F.B.I. agents in the same Chevrolet pickup truck with the inscription "Jerry's Chevrolet" as was observed in the area of the Commonwealth Bank; that the pickup truck seen in the

vicinity of the bank prior to the robbery with defendant as a passenger was observed by a Special Agent of the F.B.I. the following day, December 3, 1975, parked at the residence known as 581 Gunpowder Road, Baltimore County, Maryland; that a confidential informant who has provided reliable information in the past advised the F.B.I. that defendant was residing at this address with his wife; and, finally, that the instrumentalities and fruits of the robbery probably were concealed at 581 Gunpowder Road. Defendant singles out and quarrels with any reliance placed on information received from one described as a "confidential informant who has provided reliable information in the past." While the information received from confidential sources was helpful, unlike the situation in *Spinelli v. United States*, 393 U.S. 410, 414, 89 S.Ct. 584, 588, 21 L.Ed.2d 637 (1969), where "without it, probable cause could not be established," the remaining averments in the affidavits are sufficient in themselves to establish probable cause. It would show that defendant, with a substantial criminal record, was seen in a pickup truck loitering in the vicinity of the bank from 9:00 A.M. to noon, which was immediately prior to the robbery at 1:13 P.M.; that he was an associate and former employee of one Kalita who was under indictment for two armed bank robberies involving a similar modus operandi to the one under investigation, *viz.*, the robbers wore masks and displayed handguns; that defendant and Kalita had physical descriptions reasonably similar to the two bank robbers; that $16,000 including bait money was taken from the bank; and that the vehicle in which defendant was riding near the bank was observed by F.B.I. agents parked at 581 Gunpowder Road. *See United States v. Richard*, 535 F.2d 246 (3rd Cir. 1976). Moreover, the information received from the confidential sources need

not be disregarded completely by the Magistrate but may be considered by him if supported by other parts of the affidavit. A magistrate is obligated to render a judgment based upon a common-sense reading of the entire affidavit. *Spinelli v. United States, supra,* 393 U.S. at 415, 89 S.Ct. 584. It is true that a "simple asserta "simple assertion of police suspicion" may not "be used to give additional weight to allegations that would otherwise be insufficient," *United States v. Spinelli, supra,* 393 U.S. at 418, 419, 89 S.Ct. at 590, but the corroborating circumstances here would permit a judgment by the Magistrate that defendant and Katila were involved in the bank robbery and that the instrumentalities and fruits thereof were on the premises at 581 Gunpowder Road.[11] Magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense, *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); and their determination of probable cause should be paid great deference by reviewing courts, *Jones v. United States*, 362 U.S. 257, 270–271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Summing up, the affidavit was sufficient to justify the issuance of the warrant either with or without reliance upon the confidential reliable sources.

## WRITTEN INVENTORY

Defendant similarly lacks standing to challenge the Government's use of the slip of paper containing the entry "$6,566.00" which was obtained as a result of the search at 581 Gunpowder Road. *See* discussion *supra.* However, even assuming standing, defendant's objection that the failure to list this item on the written inventory which was filed with the Magistrate on December 10, 1975, pursuant to Fed.R.Crim.P. Rule 41(d),[12] 18 U.S.C.A.,

11. As in *United States v. Harris*, 403 U.S. 573, 580, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), the combination of statements from informants the affiant believes to be reliable, together with other corroborative factual data and affiant's own knowledge of the defendant's background, afforded a basis upon which the Magistrate could reasonably issue a warrant.

12. Rule 41(d) provides:
   "*Execution and Return with Inventory.* The officer taking property under the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken or shall leave the copy and receipt at the place from which the property

lacks merit, Special Agent Charles Matthews testified at the suppression hearing that he didn't realize that this item was not in the written inventory when he submitted it. However, he testified that it was attached to the money by a rubber band and was found on the premises on the day of the search. The return of the warrant is a ministerial act and does not void the warrant. *United States v. Haskins,* 345 F.2d 111, 117 (6th Cir. 1965). Furthermore, absent a showing of prejudice, the items received should not be excluded from the evidence because of this omission. *United States v. Moore,* 452 F.2d 569, 572–573 (6th Cir. 1971). Defendant had an adequate opportunity both at the suppression hearing and at trial to cross-examine the agents relative to where the paper was found and all circumstances surrounding its seizure as well as any reason for its omission from the inventory. In short, no prejudice was shown. *See United States v. Hall,* 505 F.2d 961, 964 (3rd Cir. 1974). Consequently, there was no error in admitting it into evidence.

## PHOTOGRAPHIC DISPLAY

Defendant challenges the in-court identification testimony of John Richards and Patricia Myers contending that they were influenced by an impermissibly suggestive pretrial photographic display. The reference to Patricia Myers deserves little comment as she testified that she was shown some photographs by the F.B.I. but couldn't pick out anyone from the photographs commenting at that time that she would recognize the man in the pickup truck if she saw him in person. She stated that none of the agents suggested any photographs to her and that nothing in the display prompted her to identify defendant in the courtroom.

Mr. Richards testified at the suppression hearing that he selected defendant's picture from a three-photograph display but added emphatically that he could identify defendant without these photographs and that he had no doubts "whatsoever" about the validity of his identification.[13] There was no showing that the photographs were such that attention was called to defendant's picture, that any emphasis was placed on his photograph, or that the agents exhibited them in any suggestive way. Moreover, both witnesses testified to having clear views of the defendant in the vehicle for a significant amount of time and their in-court identifications were positive and without hesitation. I have no difficulty in holding that the pretrial photographic identification procedure was not so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

Defendant's motion will be denied.

---

was taken. The return shall be made promptly and shall be accompanied by a written inventory of any property taken. The inventory shall be made in the presence of the applicant for the warrant and the person from whose possession or premises the property was taken, if they are present, or in the presence of at least one credible person other than the applicant for the warrant of the person from whose possession or premises the property was taken, and shall be verified by the officer. The federal magistrate shall upon request deliver a copy of the inventory to the person from whom or from whose premises the property was taken and to the applicant for the warrant."

13. Mr. Richards was not asked any questions at trial concerning the photographic display which is not surprising considering his convincing testimony at the suppression hearing.